IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIFEVANTAGE CORPORATION,<br><br>      Plaintiff and Counterclaim Defendant;<br>v.<br><br>JASON DOMINGO and OVATION<br>MARKETING GROUP, INC.,<br><br>      Defendants, Counterclaimants, and<br>      Third Party Plaintiffs;<br><br>DWIGHT TYLER DANIELS and<br>RETIREMENT OPTIONS, INC.,<br><br>      Third Party Defendants. | **MEMORANDUM DECISION GRANTING "DWIGHT TYLER DANIELS AND RETIREMENT OPTIONS, INC.'S MOTION FOR SUMMARY JUDGMENT"**<br><br>Case No. 2:13-cv-1037-JNP-PMW<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Paul M. Warner |

Before the court is "Dwight Tyler Daniels and Retirement Options, Inc.'s Motion for Summary Judgment." (Docket 194). The court heard oral argument on the motion on May 17, 2016. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court issues this Memorandum Decision Granting "Dwight Tyler Daniels and Retirement Options, Inc.'s Motion for Summary Judgment." (Docket 194).

## INTRODUCTION

LifeVantage Corporation ("LifeVantage") brought this action against defendants Jason Domingo and Ovation Marketing Group, Inc. ("Ovation") asserting claims for breach of contract and misappropriation of trade secrets. Mr. Domingo and Ovation brought counterclaims against LifeVantage for breach of contract, defamation, tortious interference, and civil conspiracy. Mr.

Domingo and Ovation have also asserted claims against third-party defendants Dwight Daniels and Retirement Options, Inc. for defamation, tortious interference and civil conspiracy.

Mr. Daniels[1] brought this motion for summary judgment arguing that he is entitled to summary judgment on Mr. Domingo's claim for defamation. Mr. Daniels first contends that he never made any defamatory statements. Second, Mr. Daniels argues that any statements he did make were covered by the judicial proceedings privilege. He then contends that without a viable claim for defamation, Mr. Domingo's claims for civil conspiracy and tortious interference fail as a matter of law.

## FACTS

A.      LifeVantage's Contractual Relationship with Mr. Domingo

LifeVantage is a publicly-traded, multilevel marketing company that distributes nutraceutical products. It sells its products through distributors, each of whom has a contractual relationship with LifeVantage. Each distributor is encouraged to sell LifeVantage products to customers and to recruit others to become LifeVantage distributors. Those new recruits subsequently recruit other distributors and so forth and so on. All of the distributors recruited by a distributor or by that distributor's recruits form a distributor's "downline." Depending on the size of their downlines, distributors are categorized in levels of "Pro 1" through "Pro 10."

Distributors earn income by two means. First, they earn commissions on the products they personally sell. Second, they earn commissions on sales made by distributors in their downline. Accordingly, a distributor with a large downline stands to earn commissions based on

---

[1] Unless otherwise noted, the court refers to Mr. Daniels and Retirement Options, Inc. jointly as Mr. Daniels.

a large number of sales. These downlines are lucrative and are the key to any distributor's

success.

Both Mr. Daniels and Mr. Domingo were high-level LifeVantage distributors. However,

Mr. Domingo, through his company Ovation, was LifeVantage's "lead distributor," meaning that

he was in the highest distributor position above all other distributors. Mr. Domingo's downline

was very lucrative, earning him a seven-figure annual income.

B.     The Termination of Mr. Domingo's Contract

In a phone call in July of 2013, Mr. Daniels told LifeVantage's CEO, Mr. Robinson, that

Mr. Domingo was "spewing a lot of negativity." In response to that phone call, Mr. Robinson

told LifeVantage's Chief Operating Officer that Mr. Domingo "won't always be there" and that

"[w]e're going to address it once and for all."

On November 1, 2013, Mr. Daniels sent Mr. Robinson a text message saying "I might

have a Jason solution." On the following day, Mr. Daniels sent Mr. Robinson an email and a

document entitled "Purchase/Buy-out of Jason Domingo." Mr. Daniels suggested that

LifeVantage could potentially buy-out Mr. Domingo's distributorship contract with LifeVantage

and impose a non-compete as part of the deal. That same day, Mr. Robinson and Mr. Daniels had

several lengthy phone conversations, but both denied being able to remember anything about

what they discussed.

The express purpose of the plan articulated in the Purchase/Buy-out memorandum was to

"[e]liminate negative influence and create unity amongst remaining Pro 10 ranks and future

qualifiers." The relevant portion of that document states:

> Because of the negative influence, continual exaggeration of
> perceived mistakes and intention to have Doug Robinson removed
> as CEO by Jason Domingo, it is increasing [sic] obvious that an
> amicable separation, if possible, may be necessary. It is arguable

that the slowdown/flat growth over the previous 12-15 months is in large part due to the continual criticism and willingness to poison existing leadership by the lead distributor. The current circumstances (selling of stock position, negative texts to leadership, negative conversations etc.) would suggest that he is going to continue this behavior and possible [sic] even get worse in order to see the position he has recently taken, ie. selling of stock, appear to be the right decision essentially creating a self fulfilling prophecy. In addition, these recent developments may have opened a door that would allow Lifevantage to offer a buy-out option to Jason Domingo that would be acceptable to both parties. This ultimately removes the negative influence and allows Lifevantage to realize the potential gains from the recent decisions by Doug Robinson without the unfair influence of Jason who cannot realize his agenda of having Doug removed if the company succeeds.

After receiving this document, Mr. Robinson sent another text message to Mr. Daniels inviting him "to attend a portion of the Board Meeting on Wednesday, November 13th." Mr. Robinson testified that Mr. Daniels' presence was requested in order to discuss "the impact of negativity in the field and lack of unity and division among field leaders." Mr. Daniels responded that he was willing to attend the meeting and that he would prepare a "possible outline" containing a "suggested course of action" for LifeVantage.

On November 4, 2013, Mr. Daniels sent an eight-page "Statement of Opinion" regarding LifeVantage's business to Mr. Robinson. Mr. Daniels suggested that Mr. Robinson make it available to others. That document appears to have been drafted in the stream-of-consciousness style and need not be reproduced in full in this opinion. The only statements in that document relevant to these motions are:

- Our lead/master distributor forgot that this is a team environment and used his influence inappropriately after it was obvious that the company was financially secure or at least was supposed to be.

- He encouraged David Brown, Kirby Zenger and Ryan Thompson to support his outside organizations more so than Marcell and I in order to balance the power or influence that individual groups may be perceived to have and also to ensure his rise to Pro10 first.

- In our distributor spotlight we printed Jason saying 'First only happens Once.' This statement is extremely inappropriate, creates division and has no place in a team environment.

- I also understand how my statement appear to be self serving at some level. I assure you that this information is being given for informational purposes only.

- After review, it was overwhelmingly in support of organizations that make up the lead distributors outside balancing organizations. I believe this was a concerted effort by Jason, David, Kirby and Ryan to elevate small organizations without giving the same level of support to the largest. This idea or decision has also been confirmed in person by Ryan Thompson to Cynthia Delaney and myself.

- This created resentment, division and an unfair distribution of corporate resources pushed for by our lead distributor and then granted and encouraged by our previous CEO and VP's of sales.

- [The] Flat Growth Period is the result of the continuing unbalanced distribution of corporate resources and recognition compounded by doubt being introduced to key leadership by our lead distributor.

- Because of David's minimal experience in MLM, it was easy for Jason to use David as a puppet in order to achieve his personal goals which don't necessarily have the company or other distributors best interests at heart.

- When he was removed, Jason lost his ability to control and influence the decision and direction of this company. Remember that his influence was being used for selfish personal interests. (Bridge money to recruit his contacts that was no available to others for example.)

- Doubt and confusion create stalled growth. Jason knows this and in order to have his agenda of removing Doug and having his puppet put back into place this company has to stop growing. Otherwise, Doug will remain as CEO. There have been several document accounts of Jason displaying this behavior.

- Unfortunately the absence of Jason's positive leadership as the Lead Distributor has required Doug to step into that role over the last couple of months.

- It is important to understand the behind the scenes agenda and efforts that have been made in an attempt to shine a negative light on Doug.

On November 8, 2013, Mr. Robinson sent Mr. Daniels a text message instructing him to use the "code name" of "Mason Flamingo" when discussing Mr. Domingo and his distributorships in order to keep their discussions on the "down low."

On November 4, 2013, Mr. Domingo sent an email to Mr. Haag stating:

> At this juncture, there is no statement too strong that speaks to the malfeasance of this management team. Greed and ego has gripped my beautiful company by its throat. Only strong action against these forces can loosen its grip. My first MLM mentor used to say, 'Time will either promote you, or expose you.' This team has been exposed. I can only hope that we have some shareholders willing to hold them accountable on Thursday's earnings call. Because so far, the toughest question asked of [Mr. Robinson] has been relative to the hiring of a new CSO.

That email was forwarded by Mr. Haag to others and eventually was received by Mr. Robinson on November 12, 2013.[2]

On November 13, 2013, Mr. Daniels attended the meeting of LifeVantage's Board of Directors with Mr. Robinson. Mr. Daniels answered questions from board members and shared opinions about "the division amongst the field leadership." Mr. Daniels was then excused from the meeting. After Mr. Daniels left, the board decided to terminate Mr. Domingo's contract and to bring a lawsuit against him.

Later that day, Mr. Robinson sent another text message to Mr. Daniels stating: "You and I need to talk. PLEASE don't share anything about your Board discussion today with ANYBODY. What we are putting in play has to be a shock and awe campaign. Anything shy of that will be devastating to the company and advantageous to [Mr. Domingo]." Mr. Daniels responded "I will watch for your call . . . anytime tonight no matter how late." Mr. Robison called Mr. Daniels at

---

[2] The court notes that, in a separate order, it held that this email constituted a material breach of Mr. Domingo's contract with LifeVantage.

9:41 PM and they spoke for 38 minutes. Both Mr. Robinson and Mr. Daniels testified that they have no recollection of what they discussed on that phone call.

LifeVantage initiated this lawsuit by filing its complaint (the "Complaint") on November 19, 2013. Mr. Mauro, an attorney and a member of LifeVantage's Board of Directors, helped draft the Complaint and gave the following testimony:

> Mr. Mauro: I'm a big believer, as I've already stated to you, that when you file a lawsuit, you make it in plain English so that anybody, any reporter, my wife, anybody could read the complaint and know exactly why you filed the lawsuit. So I was a big believer that the more people that read our—the nature of the action part of our lawsuit—the more people would understand how egregious [Mr. Domingo's] activities and actions were and how negative they were for the board. So I was pushing people to go read the complaint. And if you look at the hits we got, we were very successful at it.

> Mr. Toth: Mr. Mauro, when you say: "When you look at all the hits we got, we were successful at it," what did you mean by that?

> Mr. Mauro: I meant the people that went to the website. My lawyer would say it was gratuitous information I shouldn't have given you.

The Complaint includes the following prefatory statement:

> Instead of supporting the company and its field of distributors to help them achieve even more success, Defendants have undertaken a campaign to undermine the company and lay the ground work to compete against it, using the position of prominence, influence and access to confidential information that LifeVantage provided. Defendants' actions violate their obligations to the company and more significantly have hurt the entire field of distributors by undermining the growth of LifeVantage. Had Defendants focused their efforts on the business and properly supported other distributors and not undermined the company, the company believes it could have paid tens of millions of dollars more to its distributors. Instead, Mr. Domingo undermined the company among other distributors, causing discouragement and distractions from their efforts to build their businesses and the company subsequently missed its projected earnings with consequences to its shareholders. LifeVantage attempted to rein in Defendants' damaging campaign, but the promises Defendants made as recently

> as September 2013 to comply with their obligations were hollow.
> Shortly after promising to support the company, motivate others
> and build on the company's success, Defendants violated their
> confidentiality obligations and repeatedly attacked the company's
> management to investors, employees and distributors—falsely and
> publicly accusing management of "malfeasance" and "greed."

On the morning of November 20, 2013, Mr. Robinson sent a text message to Mr. Daniels instructing him to make sure all of the Field Advisory Board members were in attendance at the meeting scheduled for 9:00 AM at Snowbird Resort. Mr. Robinson also said that Mr. Domingo would be "called to another meeting" before then. Mr. Robinson urged Mr. Daniels "[p]lease don't make it appear as though you necessarily know something is up." Mr. Daniels responded "Absolutely" to which Mr. Robinson replied "Thanks. Game on."

That morning, Mr. Domingo was asked to meet with Mr. Mauro. Mr. Mauro informed Mr. Domingo that his contract with LifeVantage was being terminated. Mr. Domingo was then served a copy of the Complaint.

Immediately after Mr. Mauro terminated Mr. Domingo's contract, Mr. Mauro, Mr. Robinson, and another board member met with the Field Advisory Board members that Mr. Daniels had previously assembled. Mr. Mauro and Mr. Robinson read from a script and informed the Field Advisory Board that Mr. Domingo's contract had been terminated and that he was being sued by LifeVantage. Mr. Mauro and Mr. Robinson then answered questions asked by the Field Advisory Board.

A few hours later, LifeVantage  held a "Special President's Call" which was open to people "companywide." This call was declared to be "well attended" by Mr. Thompson. Mr. Robinson stated that the company had discovered "a long pattern of behavior that constituted a material breach of contract with LifeVantage and that we believe materially harmed the company and, most importantly, put your ability to succeed at risk." He continued, "[w]hen a distributor so

clearly and profoundly violates the terms of the contract, causing ongoing harm to your business and the shareholders of the company, the Board and the management team have a duty to act decisively in order to protect the interests of all LifeVantage stakeholders."

During that same call, Mr. Daniels stated:

> If most of you don't know, one thing I can recommend to do is if you want to find out exactly what—what you may not be getting as far as information goes on this call, go to the press release that was put out at the end of—of the stock market close today. It's a 19 page document. . . . In this 19 page document, it spells out very, very clearly the reasons that they had to take this action. Now, you guys, one of the things that I've had to do when I've experienced these things in the past, you have to make a decision."

The Complaint filed by LifeVantage was 19 pages long. The entire Special President's Call was posted to LifeVantage's website.

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)). On a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011)). However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the

nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original)(citation omitted).

## ANALYSIS

### I. Mr. Domingo's Defamation Claims

Mr. Daniels argues that he is entitled to summary judgment on Mr. Domingo's claims for defamation because none of the statements he made are capable of supporting a defamatory meaning. Under Utah law, to establish a claim for defamation, "the plaintiff must demonstrate that (1) the defendant published the statements [concerning the plaintiff]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *DeBry v. Godbe*, 992 P.2d 979, 982 (Utah 1999).

"Whether a statement is capable of sustaining a defamatory meaning is a question of law . . . ." *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994). If "the statement is capable of sustaining such a meaning as a matter of law, the trier of fact must then determine whether the statement was in fact so understood by its audience." *Id.* "[A] statement is defamatory if it impeaches an individual's honesty, virtue, or reputation and thereby exposes the individual to public hatred, contempt, or ridicule." *Id.* Thus, "the guiding principle is the statement's tendency to injure a reputation in the eyes of its audience." *Id.*

To support his claim for defamation against Mr. Daniels, Mr. Domingo relies on the following categories of statements: 1) the "Statement of Opinion" and the "Purchase/Buy-out Memo" written by Mr. Daniels; and 2) statements Mr. Daniels made in reference to the complaint.

1) The Statement of Opinion and The Purchase/Buy-Out Memo

Mr. Daniels wrote an eight-page "Statement of Opinion" regarding LifeVantage's business. It was sent to Mr. Robinson and Mr. Daniels suggested that Mr. Robinson make it available to others. Mr. Domingo relies on the following statements from that document that he contends are defamatory:

- Our lead/master distributor forgot that this is a team environment and used his influence inappropriately after it was obvious that the company was financially secure or at least was supposed to be.

- He encouraged David Brown, Kirby Zenger and Ryan Thompson to support his outside organizations more so than Marcell and I in order to balance the power or influence that individual groups may be perceived to have and also to ensure his rise to Pro10 first.

- In our distributor spotlight we printed Jason saying 'First only happens Once.' This statement is extremely inappropriate, creates division and has no place in a team environment.

- I also understand how my statement appear to be self serving at some level. I assure you that this information is being given for informational purposes only.

- After review, it was overwhelmingly in support of organizations that make up the lead distributors outside balancing organizations. I believe this was a concerted effort by Jason, David, Kirby and Ryan to elevate small organizations without giving the same level of support to the largest. This idea or decision has also been confirmed in person by Ryan Thompson to Cynthia Delaney and myself.

- This created resentment, division and an unfair distribution of corporate resources pushed for by our lead distributor and then granted and encouraged by our previous CEO and VP's of sales.

- [The] Flat Growth Period is the result of the continuing unbalanced distribution of corporate resources and recognition compounded by doubt being introduced to key leadership by our lead distributor.

- Because of David's minimal experience in MLM, it was easy for Jason to use David as a puppet in order to achieve his personal goals which don't necessarily have the company or other distributors best interests at heart.

- When he was removed, Jason lost his ability to control and influence the decision and direction of this company. Remember that his influence was being used for selfish personal interests. (Bridge money to recruit his contacts that was no available to others for example.)

11

- Doubt and confusion create stalled growth. Jason knows this and in order to have his agenda of removing Doug and having his puppet put back into place this company has to stop growing. Otherwise, Doug will remain as CEO. There have been several document accounts of Jason displaying this behavior.

- Unfortunately the absence of Jason's positive leadership as the Lead Distributor has required Doug to step into that role over the last couple of months.

- It is important to understand the behind the scenes agenda and efforts that have been made in an attempt to shine a negative light on Doug.

Mr. Domingo also relies upon the "Purchase/Buy-Out Memo" in his claim for

defamation. Specifically, Mr. Domingo relies on the following statements:

- An allegation by Mr. Daniels that Mr. Domingo was a "negative influence."

- A statement that Mr. Domingo "continual[ly] exaggerate[ed Mr. Robinson's] perceived mistakes."

- That Mr. Domingo intended to "have [Mr.] Robinson removed as CEO" Fourth, the statement that "[it] is arguable that the slowdown/flat growth over the previous 12-15 months is in large part due to the continual criticism and willingness to position existing leadership by the lead distributor."

- A statement that "[t]he current circumstances (selling of stock position, negative texts to leadership, negative conversations, etc.) would suggest that he is going to continue this behavior and possibly even get worse in order to see the position he has recently taken, ie. selling of stock, appear to be the right decision essentially creating a self fulfilling prophesy."

None of those statements, however, is capable of sustaining a defamatory meaning.

Rather, all of those statements are of Mr. Daniels' opinion. As the Utah Supreme Court has

explained, "[a] publication is not defamatory simply because it is nettlesome or embarrassing to

a plaintiff, or even because it makes a false statement about the plaintiff." *West*, 872 P.2d at 1009

(quoting *Cox v. Hatch*, 761 P.2d 556, 561 (Utah 1994)). These statements cannot be said to

expose Mr. Domingo to "public hatred, contempt, or ridicule" as is required to sustain a claim for

defamation. *Id.* at 1011. They are, at worst, nothing more than "sharp criticism" of Mr. Domingo

as self-serving and selfish. *Id.* at 1109. But merely calling a person selfish or self-serving in his or her business dealings, without more, cannot be defamatory.

>2)   Mr. Daniels' Statements Regarding the Complaint

Mr. Domingo also argues that he was defamed by Mr. Daniels' statements in the November 20, 2013 Special Presidents Call. In that call, Mr. Daniels stated:

> If most of you don't know, one thing I can recommend to do is if you want to find out exactly what—what you may not be getting as far as information goes on this call, go to the press release that was put out at the end of—of the stock market close today. It's a 19 page document. . . . In this 19 page document, it spells out very, very clearly the reasons that they had to take this action. Now, you guys, one of the things that I've had to do when I've experienced these things in the past, you have to make a decision."

Mr. Daniels was apparently referring to the Complaint as the "19 page document."

None of those statements themselves impeach Mr. Domingo's "honesty, integrity, virtue, or reputation" as is required to sustain a claim for defamation. *West*, 872 P.2d at 1008. Mr. Domingo's argument appears to be that Mr. Daniels statements about the Complaint constituted publication of the Complaint. But Mr. Daniels merely told others they could read the Complaint if they wanted to understand the reasons LifeVantage asserted for terminating Mr. Domingo's contract. Mr. Domingo has not provided the court with any authority holding that such a statement could qualify as publication of the Complaint itself.

Accordingly, the court finds that none of the statements Mr. Daniels is alleged to have made are capable of sustaining a defamatory meaning and Mr. Daniels is entitled to summary judgment on this claim.

## II.   **Mr. Domingo's Tortious Interference Claims**

Mr. Domingo asserts claims for tortious interference against Mr. Daniels. Under Utah law, the elements of a claim for tortious interference are: "(1) that the defendant intentionally

interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015) (citation omitted). Mr. Domingo contends that Mr. Daniels' "improper means" were the defamatory statements he made. But as was explained above, Mr. Domingo's defamation claim against Mr. Daniels fails as a matter of law. Thus, Mr. Domingo has no evidence showing that Mr. Daniels interfered with any economic relationship by improper means and Mr. Daniels is entitled to summary judgment on this claim.

### III.   Mr. Domingo's Civil Conspiracy Claim

Mr. Daniels argues that he is entitled to summary judgment on Mr. Domingo's claim of civil conspiracy. Under Utah law, to prevail on a civil conspiracy claim, a plaintiff must prove: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Peterson v. Delta Airlines, Inc.*, 42 P.3d 1253, 1257 (Utah Ct. App. 2002) (citation omitted). In this case, Mr. Domingo relies upon the claims for defamation and tortious interference against Mr. Daniels as the "unlawful, overt acts." Mr. Daniels contends that because all of the underlying tort claims against him have failed, Mr. Domingo's civil conspiracy claim must also fail.

Mr. Domingo responds with two arguments against summary judgment on this claim. First, that Mr. Daniels is also liable for Mr. Domingo's wrongful termination. Second, that the underlying tort claims he asserted against Mr. Daniels are "well-supported and warrant a full hearing at trial." But neither of these arguments is correct.

As was set forth in the court's Order Granting in Part and Denying in Part LifeVantage's Motion for Summary Judgment, LifeVantage's termination of the contract was legally justified

because of Mr. Domingo's material breach. Thus, there was no "wrongful termination" for which Mr. Daniels may be liable. Similarly, Mr. Domingo's defamation and tortious interference claims against Mr. Daniels failed as a matter of law. And Mr. Domingo has not argued that there are any other "unlawful, overt acts" to support his civil conspiracy claim. Accordingly, based on the record before the court, Mr. Daniels is entitled to summary judgment on Mr. Domingo's claim for civil conspiracy.

## CONCLUSION

The court finds that there are no material disputes regarding Mr. Domingo's claims against Mr. Daniels and the court GRANTS Mr. Daniels' Motion for Summary Judgment (Docket 194).

Signed September 8, 2016.

BY THE COURT

Jill N. Parrish
United States District Court Judge