## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIFEVANTAGE CORPORATION,<br><br>     Plaintiff and Counterclaim Defendant;<br>v.<br><br>JASON DOMINGO and OVATION MARKETING GROUP, INC.,<br><br>     Defendants, Counterclaimants, and<br>     Third Party Plaintiffs;<br><br>DWIGHT TYLER DANIELS and RETIREMENT OPTIONS, INC.,<br><br>     Third Party Defendants. | **MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART LIFEVANTAGE'S MOTION FOR SUMMARY JUDGMENT, GRANTING IN PART AND DENYING IN PART MR. DOMINGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE JUDICIAL PROCEEDINGS PRIVILEGE, AND GRANTING MR. DOMINGO'S MOTION FOR PARTIAL SUMMARY JUDGMENT RE MISAPPROPRIATION OF TRADE SECRETS**<br><br>Case No. 2:13-cv-1037-JNP-PMW<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Paul M. Warner |

Before the court are the following motions: LifeVantage's Motion for Summary Judgment (Docket 190), Defendants' Motion for Partial Summary Judgment re Judicial Proceedings Privilege (Docket 192) and Defendants' Motion for Partial Summary Judgment re Misappropriation of Trade Secrets (Docket 195). The court heard oral argument on the motions on May 17, 2016. At the conclusion of the hearing, the court took the motions under advisement. After considering the written submissions and the arguments presented at the hearing, the court issues this Memorandum Decision Granting in Part and Denying in Part LifeVantage's Motion for Summary Judgment, Granting in Part and Denying in Part Mr. Domingo's Motion for Partial Summary Judgment re Judicial Proceedings Privilege, and Granting Mr. Domingo's Motion for Partial Summary Judgment re Misappropriation of Trade Secrets.

**INTRODUCTION**

LifeVantage Corporation ("LifeVantage") brought this action against defendants Jason Domingo and Ovation Marketing Group, Inc. ("Ovation") asserting claims for breach of contract and misappropriation of trade secrets. Mr. Domingo and Ovation brought counterclaims against LifeVantage for breach of contract, defamation, tortious interference, and civil conspiracy.

LifeVantage seeks summary judgment, arguing that Mr. Domingo[1] materially breached the non-disparagement, confidentiality, and non-disclosure provisions of their contract. LifeVantage also contends that it is entitled to summary judgment on all the counterclaims asserted against it. Specifically, it argues that: 1) Mr. Domingo had already materially breached their contract; 2) any allegedly defamatory statements were privileged; and 3) Mr. Domingo has not identified any actionable economic relationships upon which he may base his tortious interference claim.

Mr. Domingo also seeks summary judgment. Specifically, he seeks summary judgment on LifeVantage's defense that its allegedly defamatory statements are protected by judicial proceedings immunity. He also seeks summary judgment on LifeVantage's claim that he misappropriated trade secrets.

**FACTS**

The parties' memoranda include over 300 pages of statements of fact. Because the court finds that many of the facts are in dispute, summary judgment is inappropriate for most of the claims. Accordingly, the court does not include in this opinion all of the facts referenced by the parties. Rather, the court includes only the facts necessary to demonstrate that material disputes

---

[1] Unless otherwise noted, the court refers to Mr. Domingo and Ovation jointly as Mr. Domingo.

2

exist for the various claims or, where applicable, that summary judgment is appropriate on a claim or defense.

      A.      LifeVantage's Contractual Relationship with Mr. Domingo

LifeVantage is a publicly-traded, multilevel marketing company that distributes nutraceutical products. It sells its products through distributors, each of whom has a contractual relationship with LifeVantage. Each distributor is encouraged to sell LifeVantage products to customers and to recruit others to become LifeVantage distributors. Those new recruits subsequently recruit other distributors and so forth and so on. All of the distributors recruited by a distributor or by that distributor's recruits form a distributor's "downline." Depending on the size of their downlines, distributors are categorized in levels of "Pro 1" through "Pro 10."

Distributors earn income by two means. First, they earn commissions on the products they personally sell. Second, they earn commissions on sales made by distributors in their downline. Accordingly, a distributor with a large downline stands to earn commissions based on a large number of sales. These downlines are lucrative and are the key to any distributor's success.

Mr. Domingo, through his company Ovation, was LifeVantage's lead distributor, meaning that he was in the highest distributor position above all other distributors. Mr. Domingo's downline was very lucrative, earning him a seven-figure annual income.

Like other LifeVantage distributors, Mr. Domingo and Ovation entered into an Independent Distributor Agreement (the "Agreement") with LifeVantage. The Agreement expressly incorporates LifeVantage's "Policies and Procedures."

The Policies and Procedures include the following "non-disparagement" clause:

      LifeVantage wants to provide its Independent Distributors with the best products, Compensation Plan and service in the industry.

> Accordingly, we value your constructive criticisms and comments. All such comments should be submitted in writing to the Distributor Support Department. Independent Distributors should not, however, disparage, demean or make negative remarks about LifeVantage, other LifeVantage Independent Distributors, LifeVantage's products, the Compensation Plan, or LifeVantage's directors, officers or employees.

The Agreement also contains a provision preventing Mr. Domingo from disclosing confidential information. Confidential information is defined as:

> Any information disclosed by LifeVantage or its Affiliates, or its or their directors, officers, agents and representatives relating to LifeVantage or its Affiliates, or any of its or their partners, collaborators, distributors, customers or agents, including any clinical or preclinical data, tangible and intangible information relating to chemical and biological materials, cell lines, samples of assay components, media and/or cell lines, know-how, trade secrets, plans, business strategy, patent rights, licenses, suppliers, designs, processes, formulas, manufacturing techniques, discoveries, inventions and ideas, improvements, developments, product specifications, machinery, drawings, photographs, equipment, devices, tools and apparatus, sales and marketing data and plans, pricing and cost information, distributor, customer, manager, staff and supplier information and any other technical or business information.

Finally, the Agreement also contains a non-solicitation provision that provides, in relevant part, that Mr. Domingo:

> shall not engage in any actual or attempted recruitment or enrollment of a LifeVantage Independent Distributor for other Network Marketing Ventures, either directly or through a third party. . . . This includes, but is not limited to, presenting or assisting in the presentation of another Network Marketing Venture to any LifeVantage Independent Distributor or Customer, or implicitly or explicitly encouraging any LifeVantage Independent Distributor or Customer to join another Network Marketing Venture.

The term recruit includes "actual or attempted solicitation, enrollment, encouragement or effort to influence in any other way, either directly or through a third party, another, LifeVantage Independent Distributor or Customer, Direct or Retail, to enroll or participate in another

multilevel marketing, network marketing or direct sales opportunity." This entire non-solicitation provision continues for six months after the termination or cancellation of the Agreement.

B.      Mr. Domingo's Communications

LifeVantage contends that Mr. Domingo breached the non-disparagement, confidentiality, and non-solicitation provisions of the Agreement through various communications. The following are the communications made by Mr. Domingo upon which LifeVantage bases its breach of contract claims.

On September 14, 2012, Mr. Domingo sent an email message to his entire downline. He wrote that "Thursday night we conducted one of the first prelaunch opportunity meetings for LifeVantage Hong Kong. The small meeting room was packed with 130 of our future partners eager for December 1 and the soft launch of their home market."

On May 2, 2013, Mr. Domingo had the following text message conversation with Jan Strode, a public relations consultant for LifeVantage:

> Ms. Strode: Don't laugh i am w prince huessin of Jordon today—do they do MLM over there?
>
> Mr. Domingo: Don't know. He hasn't called me in a very long time…like never.
>
> Mr. Domingo: You might ask him how many virgins await a top producing MLM guy in heaven, though.
>
> Mr. Domingo: Seriously, ask him to take what he's got in his sock drawer and buy our suffering company out of the grips of these clowns running it.
>
> Ms. Strode: Amen—and yes seriously I am with him all day. Just 8 of us. ;)
>
> Mr. Domingo: 6 bodyguards? Make sure they know about your claustrophobia or they're likely to shoot you if another episode like the Filipino church arises.

On June 9, 2013, Mr. Domingo sent a text message to Randolph Haag, one of LifeVantage's top investors, saying that LifeVantage had "been taken over by pirates" and that "the same old bullshit continues to play out behind the scenes. It is maddening how these pretenders got in here and took over my organization." Mr. Domingo sent a similar text message to Kirby Zenger that same month. Additionally, later in June, Mr. Domingo sent further text messages to Mr. Haag stating:

> What company changes its CEO during a steep growth phase? I mean, besides LifeVantage? . . . We have a systematic problem at the executive management and board level that is not being taken seriously. . . . Until we begin behaving and growing like a network marketing company again, I cannot assure you we will begin to grow again. . . . In the meantime, our current management team will attempt to cover-up its weaknesses by opening new markets.

On October 27, 2013, Mr. Domingo sent a text to Stu Brodie, a distributor in his downline, saying: "On the QT, we're down 1.2M with 4 days to go" apparently in reference to LifeVantage's sales performance. He sent a similar text to LifeVantage's Chief Operating Officer, Kirby Zenger, on October 30, 2013 saying: "We're still down $550k with one more day to go."

Finally, on November 4, 2013, Mr. Domingo sent an email to Mr. Haag stating:

> At this juncture, there is no statement too strong that speaks to the malfeasance of this management team. Greed and ego has gripped my beautiful company by its throat. Only strong action against these forces can loosen its grip. My first MLM mentor used to say, 'Time will either promote you, or expose you.' This team has been exposed. I can only hope that we have some shareholders willing to hold them accountable on Thursday's earnings call. Because so far, the toughest question asked of Doug [Robinson] has been relative to the hiring of a new CSO.

That email was forwarded by Mr. Haag to others and eventually was received by Mr. Robinson on November 12, 2013. At the time, Mr. Robinson was LifeVantage's CEO.

In addition to these written statements, Mr. Domingo testified that he "widely" criticized LifeVantage's decision to sponsor the Real Salt Lake Major League Soccer team. He also

6

testified that he might have said that he "knew where the skeletons are in LifeVantage" and that he "knew where the bodies were buried." He testified that he would share his complaints with any of LifeVantage's so-called Elite Distributors who asked his opinion. Sometime in the latter half of 2013, Mr. Domingo spoke to Mr. Brown, Mr. Tipps, Mr. Seeman, and Mr. Thompson, all of whom appear to be senior LifeVantage distributors in Mr. Domingo's downline or other senior employees,[2] and said "I don't want to have to start over and build yet another network marketing company from scratch, but there may come a time when that decision has to be made."

Additionally, Mr. Domingo testified that he might have told Mr. Haag of LifeVantage's long-term revenue goals and intentions. But Mr. Haag says that he is unsure who told him of those goals and that it might not have been Mr. Domingo.

Ms. Carrie Dickie, a fellow LifeVantage distributor, testified that Mr. Domingo criticized Mr. Robinson. When asked if Mr. Domingo ever said "anything about [Mr. Robinson] personally," she responded: "Yeah. It was more just that he didn't like him. And he—he said that it borderlined on criminal behavior. And I don't know what that criminal behavior was."

Mr. Tipps testified that sometime in late summer of 2013, he had a telephone conversation with Mr. Domingo. During that conversation Mr. Domingo said that "we've got to get these guys the hell out of here" in reference to LifeVantage management. And Mr. Tipps testified that Mr. Domingo may have actually said "we've got to get these fuckers out of here." Mr. Tipps also testified that Mr. Domingo complained that Mr. Robinson "hired people that had no industry background [and] that were making decisions that weren't in the best interest of the distributors."

---

[2] The parties' briefing does not clearly identify Mr. Domingo's relationship with these individuals.

Mr. Mulder, another LifeVantage distributor, testified that he and Mr. Domingo "talked a few times about whether the situation at LifeVantage was such that we should consider doing again what [Mr. Domingo] had done at Synergy and Zrii, namely leaving the Company with other top distributors to start an affiliation with a new company or to start our own network marketing company." But Mr. Domingo testified that he does not recall making such a statement.

Mr. Brodie testified that on November 13, 2013, several of the "FAB [Field Advisory Board][3] members met in Carrie Dickie's hotel to discuss the state of affairs at LifeVantage" and that Mr. Domingo "presented 'what ifs' to the group saying things like what if there was another company in which Dr. Joe McCord was involved, what if David Brown was president of that company, what if each of you were paid $20,000 per month in that company." Mr. Domingo, however, states that the meeting was organized by Ms. Dickie and it was the other distributors that were "goading each other to start anew."

C.      The Termination of Mr. Domingo's Contract

In a phone call in July of 2013, Mr. Daniels, one of LifeVantage's most senior distributors, told Mr. Robinson that Mr. Domingo was "spewing a lot of negativity." In response to that phone call, Mr. Robinson told LifeVantage's Chief Operating Officer that Mr. Domingo "won't always be there" and that "[w]e're going to address it once and for all."

On November 1, 2013, Mr. Daniels sent Mr. Robinson a text message saying "I might have a Jason [Domingo] solution." On the following day, Mr. Daniels sent Mr. Robinson an email and a document entitled "Purchase/Buy-out of Jason Domingo." Mr. Daniels suggested that LifeVantage should buy-out Mr. Domingo's Agreement and impose a non-compete as part of

---

[3] The FAB is comprised of the highest-level LifeVantage distributors.

the deal. That same day, Mr. Robinson and Mr. Daniels had several lengthy phone conversations, but both denied being able to remember anything about what they discussed.

After receiving the email, Mr. Robinson sent another text message to Mr. Daniels inviting him "to attend a portion of the Board Meeting on Wednesday, November 13th." Mr. Robinson testified that Mr. Daniels' presence was requested in order to discuss "the impact of negativity in the field and lack of unity and division among field leaders." Mr. Daniels responded saying that he was willing to attend the meeting and that he would prepare a "possible outline" containing a "suggested course of action" for LifeVantage.

On November 8, 2013, Mr. Robinson sent Mr. Daniels a text message instructing him to use the "code name" of "Mason Flamingo" when discussing Mr. Domingo and his distributorship in order to keep their discussions on the "down low."

On November 12, 2013, Mr. Haag forwarded to Mr. Robinson the email written by Mr. Domingo. As noted above, Mr. Domingo wrote that LifeVantage was "gripped by the throat" by "ego," "greed," and "malfeasance."

On November 13, 2013, Mr. Daniels attended the meeting of LifeVantage's Board of Directors with Mr. Robinson. Mr. Daniels answered questions from board members and shared his opinions about "the division amongst the field leadership." Mr. Daniels was then excused from the meeting. After Mr. Daniels left, the board decided to terminate Mr. Domingo's contract and to bring a lawsuit against him.

Later that day, Mr. Robinson sent another text message to Mr. Daniels stating: "You and I need to talk. PLEASE don't share anything about your Board discussion today with ANYBODY. What we are putting in play has to be a shock and awe campaign. Anything shy of that will be devastating to the company and advantageous to [Mr. Domingo]." Mr. Daniels responded "I will

9

watch for your call . . . anytime tonight no matter how late." Mr. Robison called Mr. Daniels at 9:41 PM and they spoke for 38 minutes. Both Mr. Robinson and Mr. Daniels testified that they have no recollection of what they discussed on that phone call.

LifeVantage initiated this lawsuit by filing its complaint (the "Complaint") on November 19, 2013. Mr. Mauro, a member of LifeVantage's Board of Directors and a licensed attorney, helped draft the Complaint. He gave the following testimony:

> Mr. Mauro: I'm a big believer, as I've already stated to you, that when you file a lawsuit, you make it in plain English so that anybody, any reporter, my wife, anybody could read the complaint and know exactly why you filed the lawsuit. So I was a big believer that the more people that read our—the nature of the action part of our lawsuit—the more people would understand how egregious [Mr. Domingo's] activities and actions were and how negative they were for the board. So I was pushing people to go read the complaint. And if you look at the hits we got, we were very successful at it.
>
> Mr. Toth: Mr. Mauro, when you say: "When you look at all the hits we got, we were successful at it," what did you mean by that?
>
> Mr. Mauro: I meant the people that went to the website. My lawyer would say it was gratuitous information I shouldn't have given you.

The Complaint includes the following prefatory statement:

> Instead of supporting the company and its field of distributors to help them achieve even more success, Defendants have undertaken a campaign to undermine the company and lay the ground work to compete against it, using the position of prominence, influence and access to confidential information that LifeVantage provided. Defendants' actions violate their obligations to the company and more significantly have hurt the entire field of distributors by undermining the growth of LifeVantage. Had Defendants focused their efforts on the business and properly supported other distributors and not undermined the company, the company believes it could have paid tens of millions of dollars more to its distributors. Instead, Mr. Domingo undermined the company among other distributors, causing discouragement and distractions from their efforts to build their businesses and the company subsequently missed its projected earnings with consequences to

> its shareholders. LifeVantage attempted to rein in Defendants'
> damaging campaign, but the promises Defendants made as recently
> as September 2013 to comply with their obligations were hollow.
> Shortly after promising to support the company, motivate others
> and build on the company's success, Defendants violated their
> confidentiality obligations and repeatedly attacked the company's
> management to investors, employees and distributors—falsely and
> publicly accusing management of "malfeasance" and "greed."

On the morning of November 20, 2013, Mr. Robinson sent a text message to Mr. Daniels instructing him to make sure all of the FAB members were in attendance at the meeting scheduled for 9:00 AM at Snowbird Resort. Mr. Robinson also said that Mr. Domingo would be "called to another meeting" before then. Mr. Robinson urged Mr. Daniels "[p]lease don't make it appear as though you necessarily know something is up." Mr. Daniels responded "Absolutely" to which Mr. Robinson replied "Thanks. Game on."

That morning, Mr. Domingo was asked to meet with Mr. Mauro. Mr. Mauro informed Mr. Domingo that his contract with LifeVantage was being terminated. Mr. Domingo was then served a copy of the Complaint.

Immediately after terminating Mr. Domingo's contract, Mr. Mauro, Mr. Robinson, and another board member met with the FAB members that Mr. Daniels had already assembled together. Mr. Mauro and Mr. Robinson read from a script and informed the FAB that Mr. Domingo's contract had been terminated and that he was being sued by LifeVantage. Mr. Mauro and Mr. Robinson then answered questions asked by the FAB.

A few hours later, LifeVantage conducted an "Elite" call with all "Pro-7 and above" distributors. On that call, Mr. Mauro and Mr. Robinson stated that Mr. Domingo had cost the company "tens of millions of dollars" that could have been paid to them because Mr. Domingo "violated his contract" and "failed to focus on his business."

LifeVantage then held a "Special President's Call" that was open to people "companywide." This call was declared to be "well attended" by Mr. Thompson. Mr. Robinson stated that LifeVantage discovered "a long pattern of behavior that constituted a material breach of contract with LifeVantage and that we believe materially harmed the company and, most importantly, put your ability to succeed at risk." He continued, "[w]hen a distributor so clearly and profoundly violates the terms of the contract, causing ongoing harm to your business and the shareholders of the company, the Board and the management team have a duty to act decisively in order to protect the interests of all LifeVantage stakeholders."

During that same call, Mr. Daniels stated:

> If most of you don't know, one thing I can recommend to do is if you want to find out exactly what—what you may not be getting as far as information goes on this call, go to the press release that was put out at the end of—of the stock market close today. It's a 19 page document. . . . In this 19 page document, it spells out very, very clearly the reasons that they had to take this action. Now, you guys, one of the things that I've had to do when I've experienced these things in the past, you have to make a decision."

The Complaint filed by LifeVantage was 19 pages long. This entire Special President's Call was posted to LifeVantage's website.

Later that afternoon, LifeVantage issued the following press release:

> November 20, 2013
>
> LifeVantage Terminates a Distributor
>
> SALT LAKE CITY, Nov. 20, 2013 (GLOBE NEWSWIRE)—LifeVantage Corporation (Nasdaq: LFVN), a company dedicated to helping people achieve healthy living through a combination of a compelling business opportunity and scientifically validated products, today announced that, at the unanimous recommendation of its Board of Directors, it has terminated for cause its relationship with Jason Domingo and Ovation Marketing Group, Inc., one of the Company's lead distributors. The Company also announced that it has filed a suit against Mr. Domingo and Ovation in Federal

Court in the State of Utah for breach of contract and misappropriation of trade secrets.

"We are absolutely committed to vigorously protecting the businesses of our loyal independent distributors," said LifeVantage President and Chief Executive Officer Douglas C. Robinson. Mr. Robinson continued, "Our Board of Directors believes that this action is appropriate in light of Mr. Domingo's actions and is critical to protect the interests of the entire LifeVantage family, including distributors, employees, preferred customers, and investors."

## LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013) (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013)). On a motion for summary judgment, the court "consider[s] the evidence in the light most favorable to the non-moving party." *Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013) (quoting *EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1037 (10th Cir. 2011)). However, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott v. Harris*, 550 U.S. 372, 380 (2007) (alterations in original) (citation omitted).

## ANALYSIS

## I.   Breach of Contract Claims and Counterclaims

### A.   LifeVantage's Breach of Contract Claims

LifeVantage argues that it is entitled to summary judgment on its breach of contract claim. LifeVantage's theory for its breach of contract claim is that Mr. Domingo breached three separate provisions of the Agreement and that, because those breaches were material, it is entitled to recover the compensation it paid to Mr. Domingo after his first material breach.[4] Under Utah law, "[t]he elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). With respect to the element of breach, "[o]nly a material breach will excuse further performance by the non-breaching party." *Cross v. Olsen*, 303 P.3d 1030, 1035 (Utah Ct. App. 2013). "Therefore, '[n]ot every minor failure justifies nonperformance and rescission of the contract.'" *Id.* (alteration in original) (quoting *Saunders v. Sharp*, 840 P.2d 796, 806 (Utah Ct. App. 1992)).

A breach is material only if it is "something so substantial that it could be reasonably deemed to vindicate the other's refusal to perform." *Id.* (quoting *Saunders*, 840 P.2d at 806). "The relevant question is not whether the breach goes to the heart of the provision breached, but whether it goes to the heart of the contract itself." *Id.* at 1036. And under Utah law, "'[w]hether a breach of a contract constitutes a material breach is a question of fact' . . . [that] will ordinarily be resolved by the fact finder." *Id.* (quoting *Orlob v. Wasatch Med. Mgmt.*, 124 P.3d 269, 275 (Utah Ct. App. 2005)).

Utah courts have identified a number of factors to be considered when determining whether a breach is material:

> (a) the extent to which the injured party will be deprived of the
> benefit which he reasonably expected; (b) the extent to which the

---

[4] Mr. Domingo has not challenged the legal sufficiency of this theory of damages on summary judgment. Accordingly, the court expresses no opinion on whether such a theory is cognizable under Utah law.

> injured party can be adequately compensated for the part of that
> benefit of which he will be deprived; (c) the extent to which the
> party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to
> perform will cure his failure[;] . . . (e) the extent to which the party
> failing to perform or to offer to perform comports with standards
> of good faith and fair dealing.

*Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)). Because LifeVantage seeks

to recover all compensation paid to Mr. Domingo after he materially breached the Agreement,

the date of the first material breach must be identified.

LifeVantage argues that Mr. Domingo materially breached three specific provisions of the

Agreement: 1) the non-disparagement clause, 2) the confidentiality clause, and 3) the non-

solicitation clause. The court will address each of these alleged breaches in turn.

### 1) The Non-Disparagement Provision

The Agreement expressly incorporates LifeVantage's "Policies and Procedures." The

Policies and Procedures include the following "non-disparagement" clause:

> LifeVantage wants to provide its Independent Distributors with the
> best products, Compensation Plan and service in the industry.
> Accordingly, we value your constructive criticisms and comments.
> All such comments should be submitted in writing to the
> Distributor Support Department. Independent Distributors should
> not, however, disparage, demean or make negative remarks about
> LifeVantage, other LifeVantage Independent Distributors,
> LifeVantage's products, the Compensation Plan, or LifeVantage's
> directors, officers or employees.

LifeVantage argues that Mr. Domingo breached this clause by disparaging the company.

LifeVantage contends that Mr. Domingo first breached this provision in May of 2013 in his text

message conversation with Ms. Strode. LifeVantage contends that Mr. Domingo's final breach

occurred on November 4, 2013, when he sent a disparaging email to Mr. Haag. The court holds

that the November 4, 2013 email was a material breach of the contract, but there are disputed

facts with regard to the earlier alleged breaches.

i.    Mr. Domingo's November 4, 2013 Email to Mr. Haag

LifeVantage argues that the November 4, 2013 email Mr. Domingo sent to Mr. Haag was, as a matter of law, a material breach of the Agreement. Mr. Domingo responds that the language of the Agreement is facially ambiguous and that a jury must resolve the ambiguity. And he argues that even if the email constituted a breach of the Agreement, it would not be a material breach. Both of these arguments will be addressed in turn.

Mr. Domingo argues that the language of the Agreement is facially ambiguous. He contends that under Utah law, the court must consider all relevant extrinsic evidence in determining whether a facial ambiguity exists. *See Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264 (Utah 1995); *see also Daines v. Vincent*, 190 P.3d 1269 (Utah 2008) (discussing *Ward*, 907 P.2d 264). In *Ward*, the Utah Supreme Court "set forth a two-part standard for determining facial ambiguity" with the first step being to consider "any relevant [extrinsic] evidence," and the second step being to "ensure that 'the interpretations contended for are reasonably supported by the language of the contract.'" *Daines*, 190 P.3d at 1276 (quoting *Ward*, 907 P.2d at 268).

However, *Ward* and *Daines* appear to be aberrations that do not accurately describe current Utah law on determining whether a contract is facially ambiguous. The court acknowledges that the Utah Supreme Court has never expressly overruled *Ward* or *Daines* and has even cited both cases recently for other propositions.[5] But *Ward* and *Daines* are irreconcilable with the Utah Supreme Court's more recent pronouncements on the subject.

---

[5] In recent years, the Utah Supreme Court has only applied a *Ward*-like test in determining the existence of a latent ambiguity. *See, e.g.*, *Watkins v. Ford*, 304 P.3d 841 (Utah 2013) (using extrinsic evidence to interpret a latent ambiguity).

The Utah Supreme Court's more recent cases demonstrate that it has, at least *sub-silentio*, rejected the *Ward* test as applied to questions of facial ambiguity. In 2009, for example, the Utah Supreme Court explained:

> Under basic rules of contract interpretation, courts first look to the writing alone to determine its meaning and the intent of the contracting parties. "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." Only where there is an ambiguity in the terms of the contract may the parties' intent be "ascertained from extrinsic evidence."

*Giusti v. Sterling Wentworth Corp.*, 201 P.3d 966, 975 (Utah 2009) (quoting *Green River Ranch Canal Co. v. Thayn*, 84 P.3d 1134, 1141 (Utah 2003); *Deep Creek Ranch, LLC v. Utah State Armory Bd.*, 178 P.3d 886, 890 (Utah 2008)); *see also Cafe Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009) (setting forth an identical approach). The Utah Supreme Court reiterated this exact standard in its most recent case regarding contractual interpretation. *See Mind & Motion Utah Investments, LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001 (Utah 2016) (articulating an identical standard). Accordingly, under Utah law, the court must first interpret the Agreement using "the writing alone to determine its meaning." *Giusti*, 201 P.3d at 975.

Mr. Domingo contends that the Agreement's non-disparagement provision is ambiguous in two respects. First, he argues that the use of the phrase "should not" is ambiguous. Second, he argues that the word "disparage" is ambiguous. But neither of these arguments is supported by the plain language of the contract.

Mr. Domingo contends that the use of the phrase "should not" means that the provision is discretionary and not mandatory. But this argument ignores the clear Utah law that courts should "avoid[ an interpretation] rendering any provision meaningless." *Peterson & Simpson v. IHC*

*Health Services, Inc.*, 217 P.3d 716, 720 (Utah 2009) (quoting *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 201 P3d 263, 269 (Utah 2009)). Mr. Domingo's interpretation of the provision as discretionary would do just that. Under his interpretation, the non-disparagement clause would be rendered meaningless because LifeVantage could never enforce such a discretionary provision. Furthermore, LifeVantage's Policies and Procedures provide that "[e]ach Independent Distributor *promises to*: . . . Speak well of LifeVantage." (Emphasis added). Thus, read in context, the non-disparagement clause is unambiguously mandatory.

Mr. Domingo next contends that the phrase "disparage" is ambiguous because the line between permissible "constructive criticism" and "disparagement" can be blurry. But this argument ignores the language of the Agreement. The Agreement provides that permissible constructive criticism must be submitted in writing to the Distributor Support Department. Mr. Domingo sent the disparaging email to Mr. Haag on November 4, 2013. It was not submitted to the Distributor Support Department. Thus, the email is not permissible constructive criticism as contemplated by the Agreement.

Furthermore, in arguing that this provision is ambiguous, Mr. Domingo has not actually identified a competing "reasonable interpretation" for the word disparage. *See Guisti*, 201 P.3d at 975. On November 4, 2013, Mr. Domingo wrote to Mr. Haag, one of LifeVantage's top investment advisors, saying that "there is no statement too strong that speaks to the malfeasance of this management team. Greed and ego has gripped my beautiful company by its throat." Mr. Domingo has not explained how *any* interpretation of the non-disparagement clause would allow him to make such remarks. Indeed, under any reasonable interpretation, the email "disparage[d], demean[ed], or ma[de] negative remarks about . . . LifeVantage's directors, officers, or employees." Accordingly the November 4, 2013 email constituted a breach of the Agreement.

18

The court holds that, as a matter of law, the breach was material. Mr. Domingo occupied a unique position in LifeVantage's organization as the lead distributor. It is undisputed that he had vast influence and, in many ways, was the "face" of LifeVantage's company at least in relation to its distributors. Given Mr. Domingo's undisputed influence, disparaging remarks by him are particularly damaging to LifeVantage. Having a lead distributor make such unequivocally disparaging remarks about LifeVantage's management to one of the most important investment advisors, is undoubtedly damaging to the company. Taken together, these facts demonstrate that Mr. Domingo materially breached the Agreement and LifeVantage's subsequent termination of the contract was justified under Utah law. *See Cross*, 303 P.3d at 1035.

    ii. Mr. Domingo's Other Alleged Breaches of the Non-Disparagement Clause

LifeVantage contends that many of Mr. Domingo's other communications also constituted a material breach of the non-disparagement provision. LifeVantage's damage theory is that it is entitled to recover all proceeds it paid to Mr. Domingo after he first materially breached the Agreement. The date of the first material breach is therefore crucial to its damage calculation. LifeVantage argues that, as a matter of law, Mr. Domingo first materially breached the Agreement on May 2, 2013 in his text message conversation with Ms. Strode.

The text-message colloquy between Ms. Strode and Mr. Domingo was as follows:

> Ms. Strode: Don't laugh i am w prince huessin of Jordon today— do they do MLM over there?

> Mr. Domingo: Don't know. He hasn't called me in a very long time…like never.

> Mr. Domingo: You might ask him how many virgins await a top producing MLM guy in heaven, though.

> Mr. Domingo: Seriously, ask him to take what he's got in his sock drawer and buy our suffering company out of the grips of these clowns running it.

> Ms. Strode: Amen—and yes seriously I am with him all day. Just 8
> of us. ;)
>
> Mr. Domingo: 6 bodyguards? Make sure they know about your
> claustrophobia or they're likely to shoot you if another episode like
> the Filipino church arises.

Even assuming those text messages were a breach of the anti-disparagement clause of the

Agreement, the question of whether that breach was material is one for the jury. A reasonable

jury could conclude that such comments made via text messages to a single public relations

consultant, especially given the flippant tone of the conversation, was not a material breach of

the contract. In short, a jury could find that the text messages do not constitute a breach "so

substantial that it could be reasonably deemed to vindicate the other's refusal to perform." *Cross*,

303 P.3d at 1035 (quoting *Saunders*, 840 P.2d at 806). On the other hand, a reasonable jury could

conclude that calling LifeVantage's management "clowns" was so disparaging as to constitute a

material breach. Similar arguments can be made with regard to most of the other allegedly

disparaging remarks made by Mr. Domingo. Thus, the question of whether those breaches were

material is properly resolved by the jury and prevents summary judgment on these issues.

 2)   The Confidentiality Provision

LifeVantage next argues that Mr. Domingo breached the confidentiality provision of the

Agreement. The Agreement prevented Mr. Domingo from disclosing LifeVantage's confidential

information. The Agreement defines confidential information as:

> Any information disclosed by LifeVantage or its Affiliates, or its or
> their directors, officers, agents and representatives relating to
> LifeVantage or its Affiliates, or any of its or their partners,
> collaborators, distributors, customers or agents, including any
> clinical or preclinical data, tangible and intangible information
> relating to chemical and biological materials, cell lines, samples of
> assay components, media and/or cell lines, know-how, trade
> secrets, plans, business strategy, patent rights, licenses, suppliers,
> designs, processes, formulas, manufacturing techniques,
> discoveries, inventions and ideas, improvements, developments,

20

> product specifications, machinery, drawings, photographs,
> equipment, devices, tools and apparatus, sales and marketing data
> and plans, pricing and cost information, distributor, customer,
> manager, staff and supplier information and any other technical or
> business information.

LifeVantage contends that Mr. Domingo violated the confidentiality provision by disclosing three types of information: first, sales data; second, the company's long-term revenue plan; and third, the date of LifeVantage's soft-launch in China.

As was set forth fully in the Facts section, it is undisputed that Mr. Domingo sent text messages to Mr. Brodie, Mr. Zenger, and Mr. Brown that disclosed some sales information in October of 2013. Likewise, Mr. Domingo testified that he may have told Mr. Haag about LifeVantage's long-term revenue goals and intentions. And on September 15, 2012, Mr. Domingo sent an email to his distribution chain referencing LifeVantage's China soft-launch date of December 1, 2012.

Even assuming that Mr. Domingo breached the Agreement by disclosing the information above, the question of the materiality of the breach is disputed. A reasonable jury might conclude that the disclosure of this information to LifeVantage distributors was not a material breach. Or it might not. These questions must therefore be resolved by the jury.

3)      The Non-Solicitation Provision

LifeVantage's final breach of contract argument is that Mr. Domingo breached the Agreement's non-solicitation provision. In relevant part, that provision states that Mr. Domingo "shall not engage in any actual or attempted recruitment or enrollment of a LifeVantage Independent Distributor for other Network Marketing Ventures, either directly or through a third party." It includes "implicitly or explicitly encouraging any LifeVantage Independent Distributor or Customer to join another Network Marketing Venture." The term recruit includes "actual or attempted solicitation, enrollment, encouragement or effort to influence in any other way, either

directly or through a third party, another, [sic] LifeVantage Independent Distributor or Customer, Direct or Retail, to enroll or participate in another multilevel marketing, network marketing or direct sales opportunity."

LifeVantage points to three specific facts that it argues demonstrate Mr. Domingo breached this provision of the Agreement. First, sometime in the latter half of 2013, Mr. Domingo spoke to Mr. Brown, Mr. Tipps, Mr. Seeman, and Mr. Thompson and said "I don't want to have to start over and build yet another network marketing company from scratch, but there may come a time when that decision has to be made."

Second, Mr. Mulder testified that he and Mr. Domingo "talked a few times about whether the situation at LifeVantage was such that we should consider doing again what [Mr. Domingo] had done at Synergy and Zrii, namely leaving the Company with other top distributors to start an affiliation with a new company or to start our own network marketing company." But Mr. Domingo testified that he does not recall making such a statement.

Third, Mr. Brodie testified that on November 13, 2013, several of the "FAB members met in Carrie Dickie's hotel to discuss the state of affairs at LifeVantage" and that Mr. Domingo "presented 'what ifs' to the group saying things like 'what if there was another company in which Dr. Joe McCord was involved,' 'what if David Brown was president of that company,' 'what if each of you were paid $20,000 per month in that company.' Mr. Domingo, however, states that the meeting was organized by Ms. Dickie and it was the other distributors that were "goading each other to start anew."

Based on those facts, LifeVantage is not entitled to summary judgment. The second and third facts on which LifeVantage relies are in dispute. Mr. Domingo testified that he does not recall making the statement to Mr. Mulder and he testified that it was the other distributors who

made the statements in the hotel room. Given those factual disputes, summary judgment is inappropriate on those alleged breaches.

With respect to the statement Mr. Domingo allegedly made "sometime in the latter half of 2013," there is a dispute as to whether this was a material breach of the Agreement. A reasonable jury could conclude that the statement, made to a single individual, about considering the mere possibility of starting a new company was not a material breach of the Agreement. Accordingly, summary judgment is inappropriate on this alleged breach.

      B.      Mr. Domingo's Breach of Contract Counterclaims

Mr. Domingo contends that LifeVantage breached the Agreement by terminating it before it expired. He also contends that his termination constituted a breach of the covenant of good faith and fair dealing. LifeVantage argues that the termination was justified under Utah law because Mr. Domingo had materially breached the Agreement.

As explained above, Mr. Domingo materially breached the Agreement by sending the disparaging email to Mr. Haag on November 4, 2013. Under Utah law, "a material breach will excuse further performance by the non-breaching party." *Cross*, 303 P.3d at 1035. Accordingly, LifeVantage did not breach the Agreement by terminating Mr. Domingo on November 20, 2013.

Mr. Domingo also contends that LifeVantage breached the implied covenant of good faith and fair dealing when it terminated the Agreement. He relies on *Cook v. Zions First National Bank* from the Utah Court of Appeals for this proposition. 919 P.2d 56 (Utah Ct. App. 1996). That case dealt with an employment contract where the employer had sole discretion to terminate the employment relationship. The court held that "[w]hen one party to a contract retains power or sole discretion in an express contract, it must exercise that discretion reasonably and in good faith." *Id.* at 60.

23

Mr. Domingo's situation is readily distinguishable from *Cook*. Here, LifeVantage did not terminate its Agreement with Mr. Domingo pursuant to a provision giving it sole discretion to do so. Rather, Mr. Domingo was terminated for cause after he materially breached the Agreement. Mr. Domingo has provided the court with no authority for the proposition that the implied covenant of good faith and fair dealing can possibly prevent a party from terminating a contract in response to the other party's material breach. Indeed, Utah law expressly allows such a termination. *See Cross*, 303 P.3d at 1035.

The court holds that LifeVantage was justified in terminating its Agreement with Mr. Domingo because of his material breach, and that LifeVantage did not breach the implied covenant of good faith and fair dealing by doing so. Accordingly, Mr. Domingo's counterclaim for breach of contract fails as a matter of law and LifeVantage is entitled to summary judgment on this counterclaim.

## II.     Mr. Domingo's Defamation Counterclaim

Mr. Domingo has asserted a counterclaim for defamation against LifeVantage. Under Utah law, to establish a claim for defamation, "the plaintiff must demonstrate that (1) the defendant published the statements [concerning the plaintiff]; (2) the statements were false; (3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *DeBry v. Godbe*, 992 P.2d 979, 982 (Utah 1999).

LifeVantage seeks summary judgment on this counterclaim arguing that any statements it made were subject judicial proceedings immunity as well as various conditional privileges. Alternatively, LifeVantage asserts that Mr. Domingo's counterclaim is barred by the economic loss rule. Mr. Domingo disagrees and argues that he is entitled to summary judgment on

LifeVantage's judicial proceedings immunity defense. He also contends that there are disputes of material fact that prevent summary judgment with respect to LifeVantage's conditional privilege defenses. Finally, he argues that the economic loss rule does not apply to defamation claims. Each of these arguments will be addressed in turn.

    A.  LifeVantage's Defense of Judicial Proceedings Privilege

Mr. Domingo argues that he is entitled to summary judgment on LifeVantage's defense of judicial proceedings privilege to his defamation claims. Under Utah law, "false and defamatory statements are not actionable if they are protected by a legal privilege." *Id.* at 983. "To establish the judicial proceeding privilege, the statements must be (1) 'made during or in the course of a judicial proceeding'; (2) 'have some reference to the subject matter of the proceeding'; and (3) be 'made by someone acting in the capacity of judge, juror, witness, litigant, or counsel.'" *Id.* (quoting *Price v. Armour*, 949 P.2d 1251, 1256 (Utah 1997)). This privilege "is intended to promote the integrity of the adjudicatory proceeding and its truth finding process." *Id.* It "facilitates the 'free and open expression by all participants . . . [which] will occur only if they are not inhibited by the risk of subsequent defamation suits.'" *Id.* (alterations in original) (quoting *Allen v. Ortez*, 802 P.2d 1307, 1311 (Utah 1990)).

"[T]he requirement that the defamatory statement must be made in the course of a judicial proceeding requires a broad interpretation of the term 'judicial proceeding.'" *Id.* It is broad enough to include "defamatory matter . . . not only when made in the institution of the proceedings or in the conduct of litigation before a judicial tribunal, but in conferences and in other communications preliminary thereto." *Id.* (quoting *Beezley v. Hansen*, 286 P.2d 1057, 1058 (Utah 1955)). But even that broad interpretation has limits. The Utah Supreme Court has held "that the press generally lack a connection to judicial proceedings sufficient to warrant an

extension of the judicial privilege to statements made by parties to the press." *Pratt v. Nelson*, 164 P.3dd 366, 380 (Utah 2007).

Mr. Domingo argues that the judicial proceedings privilege either does not apply or was lost due to excessive publication with respect to two categories of statements: first, the November 20, 2013 conference calls, and second, the Complaint and statements about the Complaint. The court will address each category in turn.

1)  The November 20, 2013 Conference Calls

Mr. Domingo argues that the judicial proceedings privilege does not apply to the two conference calls made by LifeVantage on November 20, 2013. He argues that the calls were not "made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." LifeVantage responds that the calls "were made in the course of a judicial proceeding" as that term has been interpreted because they were made "in conferences and in communications preliminary thereto." *See Krouse v. Bower*, 20 P.3d 895, 898–899 (Utah 2001). It contends that the conference calls were "all directly related to the then-recently filed lawsuit against Mr. Domingo" and that the participants all had "a strong interest in the lawsuit." But these are not the type of "conferences" that are protected by the privilege.

The November 20, 2013 conference calls were not made in the course of a judicial proceeding. Rather, those calls were made by LifeVantage executives to independent distributors, none of whom had a legal interest in the resolution of the lawsuit. These were not conferences conducted preliminary to a judicial proceeding. They did not discuss litigation strategy, witness statements, or advice from counsel. In fact, at least one of the conference calls was posted to LifeVantage's website. This fact alone belies the contention that the calls were really attorney conferences in preparation for the litigation. The conference calls "played no legitimate role in resolving the dispute between the parties." *Pratt*, 164 at 380.

Furthermore, not every statement a litigant makes is covered by the judicial proceeding privilege. Only those statements "made by someone acting in the capacity of judge, juror, witness, litigant, or counsel" can be protected by the privilege. *DeBry*, 992 P.2d at 983 (quoting *Price*, 949 P.2d at 1256). None of LifeVantage's executives can be said to have been making the conference calls in the capacity of a witness or litigant. Accordingly, the statements are not protected by the judicial proceedings privilege. Thus Mr. Domingo is entitled to summary judgment regarding LifeVantage's defense of judicial proceedings privilege with respect to the statements made in the November 20, 2013 conference calls.

2)      The Alleged Excessive Publication of the Complaint

Mr. Domingo next contends that the statements contained in the Complaint were defamatory and that the Complaint's privileged status was lost due to excessive publication. Under Utah law, "[a] party may lose the absolute immunity afforded by the judicial proceeding privilege through 'excessive publication.'" *Pratt*, 164 P.3d at 377. "[A] publication is excessive if the statement was published to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation, in other words, if the [statement] was published to those who did not have a legitimate role in resolving the dispute, or if it was published to persons who did not have an adequate legal interest in the outcome of the proposed litigation." *Id.* (second alteration in original) (quoting *Krouse*, 20 P.3d at 900). When determining whether "a statement was excessively published, [courts] look to the 'overall circumstances' of the publication and determine if the purpose of the judicial proceeding privilege, which is to 'promote candid and honest communication between the parties and their counsel in order to resolve disputes,' is furthered by the statement's publication." *Id.* (quoting *Krouse*, 20 P.3d at 900).

Mr. Domingo contends that the judicial proceedings privilege applicable to the Complaint was lost by LifeVantage posting the Complaint to its website, instructing others to use the

27

Complaint as "talking points," and by intentionally drafting the Complaint in such a way as to attract attention from others with no legal interest in the lawsuit. LifeVantage raises two arguments in response. First, it contends that because the Complaint was a matter of public record, it could not be excessively published. Second, it argues that the facts do not support Mr. Domingo's allegations about the extent of any publication.

LifeVantage contends that "publication of a document intended to be available to the public at large is not 'excessive.'" And the Complaint was already publicly available on the court's electronic docket. But this argument is unsupported by Utah law. The Utah Supreme Court has made clear that excessive publication overcomes judicial proceedings immunity. The relevant inquiry is whether the statement was "'published to more persons than necessary to resolve the dispute or further the objectives of the proposed litigation.'" *Id.* (quoting *Krouse*, 20 P.3d at 900). The focus of the inquiry is on the party's publication, not whether the same information could have been found through other sources. In short, the statements made in a complaint are initially protected by the judicial proceedings immunity. But if that complaint is excessively republished, in ways unconnected to the judicial proceeding, that privilege may be lost. The court must therefore consider whether the Complaint was excessively published as a matter of fact.

LifeVantage next argues that the record does not support Mr. Domingo's contention of excessive publication. To support his contention that LifeVantage posted the Complaint to its website, Mr. Domingo relies on the following deposition testimony from Mr. Mauro:

> Mr. Mauro: I'm a big believer, as I've already stated to you, that when you file a lawsuit, you make it in plain English so that anybody, any reporter, my wife, anybody could read the complaint and know exactly why you filed the lawsuit. So I was a big believer that the more people that read our—the nature of the action part of our lawsuit—the more people would understand how

egregious [Mr. Domingo's] activities and actions were and how negative they were for the board. So I was pushing people to go read the complaint. And if you look at the hits we got, we were very successful at it.

Mr. Toth: Mr. Mauro, when you say: "When you look at all the hits we got, we were successful at it," what did you mean by that?

Mr. Mauro: I meant the people that went to the website. My lawyer would say it was gratuitous information I shouldn't have given you.

LifeVantage argues that this testimony does not establish that the Complaint was ever posted to its website. Mr. Mauro does not explain to which website he refers, and it is possible that he meant that after filing the Complaint, LifeVantage's website received an increased number of hits in general. On the other hand, a reasonable jury could conclude that Mr. Mauro's testimony evidenced that the Complaint was posted on LifeVantage's website and that the website "hits" to which he referred were to the Complaint. Such a conclusion may render the judicial proceedings privilege inapplicable to LifeVantage's statements made in the Complaint or about the Complaint. This factual dispute prevents summary judgment with respect to LifeVantage's judicial proceedings immunity defense as it applies to the allegedly defamatory statements contained in the Complaint.

B.      LifeVantage's Defenses of Conditional Privilege

Alternatively, LifeVantage argues that it is entitled to summary judgment on Mr. Domingo's defamation claim because all of the allegedly defamatory statements were subject to various conditional privileges. "Under the law of defamation, false and defamatory statements are not actionable if they are protected by a legal privilege." *DeBry*, 992 P.2d at 983. But Utah law also makes clear that a party cannot assert a conditional privilege if the defamed party can demonstrate that the statements were made with "actual malice," meaning that "the utterances were made from spite, ill will or hatred toward him." *Thomas v. PacifiCorp*, 324 F.3d 1176, 1181

(10th Cir. 2003) (quoting *Combes v Montgomery Ward & Co.*, 228 P.2d 272, 277 (Utah 1951)). The burden is on the plaintiff to prove that the allegedly defamatory statements were made maliciously. *Alford v. Utah League of Cities & Towns*, 791 P.2d 201, 205 (Utah Ct. App. 1990).

LifeVantage contends that "none of the evidence cited by [Mr. Domingo] demonstrates spite or ill will." But this is disputed. The court need not set forth all the facts demonstrating that Mr. Domingo's and Mr. Robison's relationship was sufficiently strained to allow a jury to find that the allegedly defamatory statements were made with hatred. Rather, a few examples suffice to demonstrate the disputed facts. Mr. Domingo has evidence that Mr. Robinson and LifeVantage engaged in a "shock and awe" campaign to harm Mr. Domingo's reputation and cause him to lose his lucrative downline. Mr. Domingo has also presented evidence that Mr. Robinson and Mr. Daniels intensely disliked Mr. Domingo and both believed that they would benefit financially from Mr. Domingo's termination. A reasonable jury could conclude, based on those facts, that LifeVantage acted with malice in making the allegedly defamatory statements. Accordingly, LifeVantage is not entitled to summary judgment on its conditional privilege defenses to Mr. Domingo's defamation counterclaim.

C.      LifeVantage's Defense of the Economic Loss Rule

LifeVantage's next argument is that Mr. Domingo's claim for defamation is barred by the economic loss rule. The economic loss rule marks the dividing line between claims for negligence-based torts and claims for breach of contract. Thus the rule "prohibits recovery of economic losses" in a claim for negligence "[a]bsent physical property damage [i.e. damage to other property,] or bodily injury." *Davencourt at Pilgrims Landing Homeowners Ass'n v. Davencourt at Pilgrims Landing, LC*, 221 P.3d 234, 242 (Utah 2009) (second alteration in original) (citation omitted). "In other words, economic damages are not recoverable *in negligence* absent physical property damage or bodily injury." *American Towers Owners Ass'n v.*

*CCI Mechanical, Inc.*, 930 P.2d 1182, 1189 (Utah 1996) (emphasis added). But the rule does not apply to intentional torts. *Id.* (explaining that "[t]he 'economic loss rule' is . . . that one may not recover 'economic' losses under a theory of non-intentional tort"). Accordingly, the court holds that the economic loss rule does not bar Mr. Domingo's claim for the intentional tort of defamation and Mr. Domingo is entitled to summary judgment on this defense.

D.      Mr. Domingo's Claim of Special Damages

At oral argument, counsel for Mr. Domingo explained that Mr. Domingo has advanced two theories of damages for defamation. First are the general damages caused by LifeVantage's alleged defamation. Second are special damages in the form of the revenue that Mr. Domingo lost after LifeVantage's termination of the Agreement. As set forth above, Mr. Domingo's claim against LifeVantage for defamation survives summary judgment. But as was also set forth above, LifeVantage was legally justified in terminating its Agreement with Mr. Domingo. And the termination occurred before the alleged defamatory statements were made. Thus Mr. Domingo will not be allowed to recover the lost revenue arising from the termination of his Agreement through his defamation counterclaim. Rather, he will be confined to his theory of general damages.

## III.   Mr. Domingo's Tortious Interference Claims

Mr. Domingo claims that LifeVantage tortiously interfered with the business relationships he had with all the distributors in his downline. LifeVantage seeks summary judgment on this claim. Under Utah law, the elements of tortious interference are: "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) . . . by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 345 P.3d 553, 556 (Utah 2015). "The tort of intentional interference . . . reaches beyond protection of an interest in an existing contract and protects a party's interest in prospective relationships of economic

31

advantage not yet reduced to a formal contract (and perhaps not expected to be)." *Leigh Furniture & Carpet Co.v. Isom*, 657 P.2d 293, 302 (Utah 1982).

LifeVantage argues that it is entitled to summary judgment because Mr. Domingo cannot "identify any existing or potential economic relationship with which LifeVantage interfered that can form the basis of this counterclaim." The existing and prospective economic relationships upon which Mr. Domingo relies are the relationships with the distributors in his "downline." Mr. Domingo admits that he never had, nor did he expect to have, a contract with any LifeVantage distributors. Rather, all of the independent distributors in his downline had contracts with LifeVantage and not with Mr. Domingo. And under Utah law, "[i]t is settled that one party to a contract cannot be liable for the tort of interference with the contract for inducing a breach by himself of the other contracting party." *Leigh Furniture*, 657 P.2d at 301. Because Mr. Domingo admits that the sole benefit he received from other LifeVantage distributors was LifeVantage's payment to him of commissions, LifeVantage argues that he can have "no reasonable economic expectancy except through [his] own contract with LifeVantage."

Mr. Domingo responds that he "had very valuable existing and prospective economic relations with people in his downline organization and those who may join that organization— regardless of any formal contract between [himself] and those distributors and potential distributors." But Mr. Domingo's Agreement with LifeVantage includes a six-month non-solicitation clause that began to run on the date LifeVantage terminated the Agreement. Because he was contractually barred from creating any economic relations with the distributors in his downline, Mr. Domingo has not identified any prospective economic relations with which LifeVantage tortiously interfered. Accordingly, LifeVantage is entitled to summary judgment on this claim.

Mr. Domingo's lack of evidence regarding damages on this claim also provides an independent basis for summary judgment. Mr. Domingo's expert testified that all of the damage calculations he performed were based on the loss of Mr. Domingo's LifeVantage distributorship. But as discussed above, LifeVantage was legally justified in terminating the Agreement because of Mr. Domingo's material breach. Accordingly, Mr. Domingo may not recover damages arising from the termination of that Agreement. Because Mr. Domingo has provided the court with no evidence of any other damages, LifeVantage is alternatively entitled to summary judgment on Mr. Domingo's counterclaims for tortious interference based on Mr. Domingo's failure to come forward with any evidence of recoverable damages.

## IV.    Mr. Domingo's Civil Conspiracy Claim

LifeVantage argues that it is entitled to summary judgment on Mr. Domingo's claim of civil conspiracy. Under Utah law, to prevail on a civil conspiracy claim, a plaintiff must prove: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof." *Peterson v. Delta Airlines, Inc.*, 42 P.3d 1253, 1257 (Utah Ct. App. 2002) (citation omitted). In this case, Mr. Domingo relies upon his claims of defamation and tortious interference against LifeVantage as the "unlawful, overt acts" furthering the conspiracy. LifeVantage's sole argument on this claim is that because Mr. Domingo's claims for defamation and tortious interference fail, his civil conspiracy claim must also fail. But the court declined to enter summary judgment in favor of LifeVantage on Mr. Domingo's defamation counterclaim. Accordingly, LifeVantage has not demonstrated that it is entitled to summary judgment on Mr. Domingo's claim for civil conspiracy.

**V.      LifeVantage's Misappropriation of Trade Secrets Claim**

Mr. Domingo argues that he is entitled to summary judgment on LifeVantage's claim for misappropriation of trade secrets. He advances three arguments in support of his position. First, he asserts that LifeVantage's misappropriation of trade secrets claim fails because it has no evidence of any damages caused by Mr Domingo's alleged misappropriation. Second, he asserts that none of the information on which the claim is based qualifies as a protectable trade secret. Finally, he argues that LifeVantage has presented no evidence of misappropriation. The court holds that LifeVantage's misappropriation claim fails for lack of damages. Accordingly, the court need not address Mr. Domingo's alternative arguments.

Under the Utah Uniform Trade Secrets Act, a plaintiff may recover "both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss." UTAH CODE § 13-24-4(1). And under Utah law, a plaintiff must "come forward with admissible 'evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages.'" *Borghetti v. Sys. & Computer Tech, Inc.*, 199 P.3d 907, 916 (Utah 2008) (citation omitted).

LifeVantage argues that it suffered an actual loss by continuing to pay Mr. Domingo after he breached his Agreement by misappropriating trade secrets. But LifeVantage has not demonstrated that the damages it seeks were caused by the misappropriation. And the statute expressly requires such causation. *See* UTAH CODE § 13-24-4(1).

Although it appears that the Utah Supreme Court has never opined on what precisely must be shown to demonstrate causation in this context, LifeVantage cannot satisfy even the most liberal "but-for" test. To establish but-for causation, a plaintiff must show that had the defendant not committed the wrongful act, the damages would not have been suffered. In this

case, the damages that LifeVantage seeks are the commissions that it paid Mr. Domingo after he misappropriated the trade secrets. But the alleged misappropriation was not the but-for cause of LifeVantage's commission payments to Mr. Domingo. In other words, Mr. Domingo still would have been paid under the Agreement whether or not he misappropriated trade secrets.

LifeVantage has not presented the court with any other evidence on which a jury could base an award of damages. In fact, LifeVantage's damages expert testified that he had not done "any kind of damage calculation for a claim of misappropriation of trade secrets." In short, LifeVantage has not presented any evidence that the trade secrets Mr. Domingo allegedly misappropriated caused any actual loss to the company.

LifeVantage next argues that the Utah Uniform Trade Secrets Act expressly allows damages in the amount of the value of any unjust enrichment gained by the misappropriator regardless of actual loss. While the statute does allow such a recovery, LifeVantage has never before disclosed that it intends to proceed on such a theory. A party may not avoid summary judgment by articulating, for the first time, a completely novel theory of damages. And even if LifeVantage were allowed to now advance this new theory, LifeVantage has failed to provide any evidence on which a jury could reasonably base a damage calculation. It has provided the court with no estimate of the amount of unjust enrichment Mr. Domingo reaped. And, as noted above, LifeVantage's damages expert expressly testified that he performed no such calculation.

LifeVantage has no evidence that it was damaged by Mr. Domingo's alleged misappropriation of trade secrets. Accordingly, Mr. Domingo is entitled to summary judgment on this claim.

**CONCLUSION**

The court holds that Mr. Domingo materially breached his Agreement with LifeVantage on November 4, 2013. But there are disputed facts with respect to the other alleged breaches. Additionally, the court holds that Mr. Domingo has not demonstrated that LifeVantage tortuously interfered with any prospective economic relationship. Accordingly, LifeVantage's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. (Docket 190). The court holds that the conference calls are not protected by the judicial proceedings privilege but that there are disputed facts with respect to whether the immunity applies to other allegedly defamatory statements. Accordingly, Mr. Domingo's Motion for Partial Summary Judgment re Judicial Proceedings Privilege Defense is GRANTED IN PART AND DENIED IN PART. (Docket 192). The court also finds that LifeVantage has not demonstrated any damages caused by Mr. Domingo's alleged misappropriation of trade secrets. Thus, Mr. Domingo's Motion for Partial Summary Judgment re Misappropriation of Trade Secrets is GRANTED. (Docket 195).

Signed September 8, 2016.

BY THE COURT

Jill N. Parrish
United States District Court Judge