IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| LIFEVANTAGE CORPORATION, a Colorado corporation,<br><br>                Plaintiff,<br>v.<br><br>JASON DOMINGO, an individual and OVATION MARKETING GROUP, INC., a Nevada corporation,<br><br>                Defendants. | SEALED<br><br>**MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT TO DISMISS WITH PREJUDICE LIFEVANTAGE'S BREACH OF CONTRACT CLAIM**<br><br>Case No. 2:13-cv-1037-JNP-PMW<br><br>District Judge Jill N. Parrish<br>Magistrate Judge Paul M. Warner |

Before the court is a motion for summary judgment filed by Defendants Jason Domingo and Ovation Marketing Group, Inc. Docket 311. Defendants seek summary judgment and dismissal of Plaintiff LifeVantage Corporation's ("LifeVantage") claim for breach of contract, arguing that LifeVantage has no viable damages claim. For the reasons set forth below, the court DENIES Defendants' motion.[1]

## INTRODUCTION AND BACKGROUND

In the court's September 8, 2016 Memorandum Decision concerning the parties' previously filed motions for summary judgment, the court held that Defendants materially breached their contract (comprised of the Distributor Agreement and the LifeVantage Policies and Procedures incorporated therein) with LifeVantage on November 4, 2013, but that there were disputed issues of material fact with respect to the earlier breaches alleged by LifeVantage.

---

[1] Pursuant to DUCivR 7-1(f), the court resolves this motion on the basis of the written memoranda, finding that oral argument would not be helpful.

Docket 302 at 15. The court explained that Defendants' breach was "particularly damaging," and "undoubtedly damaging to [LifeVantage]." *Id.* at 19. The court observed that under LifeVantage's damages theory, it claims to be "entitled to recover the compensation it paid to [Defendants] after their first material breach," but the court noted that it "expresse[d] no opinion on whether such a theory is cognizable under Utah law." *Id.* at 14 n.4. Defendants now bring this motion arguing that LifeVantage's damages theory is improperly based on principles of restitution or unjust enrichment and is not cognizable under Utah law.[2] Specifically, Defendants argue that *TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929 (Utah 2008), forecloses LifeVantage's damages theory. LifeVantage responds that its damages theory is cognizable under Utah law because the *TruGreen* case is distinguishable, and furthermore that the remedy it seeks is specifically provided by the parties' agreement. The court concludes that (1) *TruGreen* does not foreclose LifeVantage's damages theory, (2) its theory is cognizable under Utah law and in line with settled principles of contract damages, and (3) LifeVantage's damages theory is independently cognizable in this case because it is the remedy afforded to it by the parties' agreement.

## DISCUSSION

I.  **Summary Judgment Standard**

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine only if "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d

---

[2] LifeVantage argues that Defendants' motion is untimely because Defendants bring it nearly a year after the dispositive motions deadline. However, the court granted permission for Defendants to bring this motion at a Status and Scheduling Conference on November 17, 2016. Docket 326 at 13–17.

708, 712 (10th Cir. 2014). "In making this determination, 'we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Id.* at 712–13 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

## II. LifeVantage's Damages Theory

LifeVantage claims to be entitled to recover the compensation it paid to Defendants after their first material breach of the parties' agreement. LifeVantage relies on an expert report prepared by Brad Townsend (the "Townsend Report") as evidence of the amount of that compensation. The Townsend Report analyzes and summarizes the payments made by LifeVantage to Defendants, pursuant to LifeVantage's claim for reimbursement of compensation paid to Defendants after the alleged breach. Docket 306-4, ¶ 14. The Townsend Report includes a schedule of the payments that "can be used to determine the amount of damages to award to LifeVantage, should the finder of fact conclude that Defendants breached the distributorship agreements on a particular date and should, therefore, return payments made by LifeVantage after that date." *Id.* at ¶ 21. *See* Docket 311-1 Sched. A (filed under seal).

## III. *TruGreen* Does Not Foreclose LifeVantage's Damages Theory

Defendants argue that LifeVantage's damages theory as it has been articulated and presented by the Townsend Report is not cognizable under Utah law because it represents an improper restitution or unjust enrichment theory of damages. Defendants rely on *TruGreen Cos., L.L.C. v. Mower Bros., Inc.*, 199 P.3d 929 (Utah 2008) for the proposition that the proper measure of damages for a breach of contract is lost profits and that "restitution or unjust enrichment is not an appropriate measurement in these actions." *Id.* at 933. The *TruGreen* court held that "it is the loss sustained by the plaintiff that provides the core measure of damages for the breach of non-compete clauses. The gains enjoyed by the breaching employee can be relevant to that damage inquiry, but cannot alone support a damage award." *Id.* at 933. Defendants argue

that under *TruGreen* it would be inappropriate to allow LifeVantage to recover the compensation it paid to Defendants after the first material breach because that would constitute a restitution measure of damages, rather than one based on LifeVantage's lost profits. LifeVantage responds that *TruGreen* is factually distinguishable from this case.

The court agrees with LifeVantage that there are important factual distinctions between *TruGreen* and the present case. In this case, Defendants breached a *non-disparagement provision* of their contract with LifeVantage. In contrast, the *TruGreen* court addressed "whether under Utah law a former employer is entitled to an award of lost profits damages, or instead an award of restitution or unjust enrichment damages, where a former employee has breached contractual *non-competition, non-disclosure, and employee non-solicitation provisions*." *Id.* at 931 (emphasis added). Indeed, when the *TruGreen* court held that "restitution or unjust enrichment is not an appropriate measurement in *these* actions," *id.* at 933 (emphasis added), it was referring to actions involving breaches of non-competition, non-disclosure, and employee non-solicitation provisions. As a practical matter, the damages that arise from the breach of a non-disparagement provision differ from the damages that arose from the breach of the non-compete provisions at issue in *TruGreen*. A non-disparagement provision seeks to protect the image and reputation of a contracting party, while non-compete, non-disclosure and non-solicitation provisions protect a contracting party's ability to compete with others in the marketplace.

The importance of this distinction is further emphasized because of what the non-breaching party sought to recover in *TruGreen*. In *TruGreen*, the non-breaching party sought to "recover *the economic benefit realized by [the breaching party]* attributable to the breach of its employment contract," i.e., the profits that the former employee had received from third parties while competing with the former employer. *Id.* (emphasis added). In contrast here, LifeVantage seeks to recover the value of the payments it made to Defendants after they breached the

4

contractual non-disparagement provision. Unlike the amounts at issue in *TruGreen*, payments LifeVantage made to Defendants in ignorance of Defendants' disparagement constitute LifeVantage's own *losses* and not Defendants' *gains*. In short, LifeVantage is not seeking restitution or unjust enrichment damages. Rather, LifeVantage is seeking to recoup its losses, and those losses are equivalent to those amounts it paid to Defendants while unaware of Defendants' ongoing breach of contract. These factual distinctions remove this case from the ambit of the central holding in *TruGreen*. Accordingly, *TruGreen* does not foreclose LifeVantage's damages theory.

## IV. LifeVantage's Damages Theory Is Cognizable And Supported Under Principles Of Utah Contract Law

Because LifeVantage's damages theory is its attempt to recoup its own losses, its damages theory is cognizable and supported under Utah contract law. It is axiomatic under Utah law that a plaintiff alleging a breach of contract claim must prove both the fact of damages as well as the amount of damages. *See Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 305 P.3d 171, 176 (Utah 2013) (citation omitted); *Bair v. Axiom Design, L.L.C.*, 20 P.3d 388, 392 (Utah 2001). "Plaintiff . . . has the burden to produce a sufficient evidentiary basis to establish the fact of damages and to permit the trier of fact to determine with reasonable certainty the amount of [damages]." *Sawyers v. FMA Leasing Co.*, 722 P.2d 773, 774 (Utah 1986). *See also Sunridge Dev. Corp.*, 305 P.3d at 176 (citation omitted) (explaining that to prove the amount of damages, the plaintiff must produce "evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages"). "[T]he injured party in a breach of contract action has a right to damages based upon his expectation interest as measured by (a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any

cost or other loss that he has avoided by not having to perform." *Ford v. Am. Express Fin. Advisors, Inc.*, 98 P.3d 15, 26 (Utah 2004) (emphasis and citation omitted).

Although *TruGreen* is factually distinguishable from this case and its central holding inapplicable to this case, many of the general principles of contract damages articulated in *TruGreen* are broadly applicable and in fact support the viability of LifeVantage's damages theory under Utah contract law. The *TruGreen* court "recognize[d] the difficulty of calculating damages" in many situations and stated that it would allow a plaintiff to use evidence of a defendant's gains to prove the plaintiff's own loss. *Id.* at 933. But the *TruGreen* court cautioned that in doing so "a plaintiff must do more than merely state a defendant's profits when claiming damages. There must be some correspondence between the [defendant's profits and the loss sustained by plaintiff as a result of the breach] so that the claim of damages is more than mere speculation." *Id.* LifeVantage's damages theory satisfies the test. The loss that LifeVantage claims to have suffered corresponds exactly with the bonus and commission checks it paid to Defendants, precisely because they were paid by LifeVantage. Indeed, the bonus and commission checks LifeVantage paid to Defendants are more accurately considered a loss to LifeVantage than they are a profit or gain to Defendants. The LifeVantage Distributor Compensation Summary makes clear that commissions and bonuses "do not represent a Distributor's profit, as they do not consider expenses incurred by a Distributor in the promotion of his/her business and do not include retail markup income." Docket 306-2 at 3. But the commissions and bonuses paid to Defendants do accurately represent LifeVantage's alleged loss because they were paid by LifeVantage.

LifeVantage's damages theory is no different from damages theories in many cases involving a claim for breach of contract. LifeVantage had an agreement with Defendants under which LifeVantage was to compensate Defendants for, among other things, selling product,

providing assistance and training to Defendants' downline, motivating Defendants' downline, and otherwise providing leadership to the company and its distributors. Defendants' fulfillment of their duties was especially important (and therefore well compensated) because Defendant Mr. Domingo occupied a unique position in LifeVantage's organization as the lead distributor. A contracting party is entitled to the benefit of its bargain. It is undisputed that Mr. Domingo had vast influence and, in many ways, was the "face" of LifeVantage's company, at least in relation to its distributors. When Defendants breached their agreement with LifeVantage by disparaging LifeVantage and its management, LifeVantage was deprived of its bargain by making payments to Defendants without receiving the bargained-for leadership, motivation, and example in return. It therefore follows that LifeVantage's claim to recoup the payments it made for services that it did not receive is an appropriate measure of "the loss in the value to [LifeVantage] of the [Defendants'] performance caused by [their] failure or deficiency." Therefore, LifeVantage's damages theory is cognizable and in line with general contract damages principles of Utah law.[3]

V. **LifeVantage's Damages Theory Is The Remedy Afforded To It Under The Parties' Agreement**

Not only is the damages theory presented by the Townsend Report cognizable under Utah law generally, it is also available here because it is the very remedy afforded to LifeVantage under the parties' agreement. LifeVantage argues that the Remedies provision of the LifeVantage Policies and Procedures agreement (the "P&P")[4] provides it with the right to recover the bonus and commission checks that it paid to Defendants from the time Defendants first breached the contract. Defendants, on the other hand, argue that the Remedies provision contemplates only the

---

[3] The parties' agreement incorporates remedies generally available in a breach of contract action. Section 14.1 of the Policies and Procedures provides "[t]he commencement of legal proceedings for monetary or equitable relief or both" as one of the potential remedies available if a distributor breaches the agreement. Docket 333-1.

[4] The P&P is found at Docket 333-1.

loss of rights to bonus or commission checks that have not yet been paid when LifeVantage invokes the Remedies provision.

> The Remedies provision, found at Section 14.1 of the P&P, states:
>
> Any breach of the Agreement, including these Policies and Procedures, or any illegal, fraudulent, deceptive or unethical business conduct by an Independent Distributor may result, at LifeVantage's discretion, in one or more of the following actions:
> . . .
> > Loss of rights to one or more bonus and commission checks; in whole or in part.

In interpreting this provision, we seek to ascertain the intent of the contracting parties. *See WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1144 (Utah 2002) ("The underlying purpose in construing or interpreting a contract is to ascertain the intentions of the parties to the contract."). "To ascertain the parties' intentions, we look to the plain meaning of the contractual language . . . and we consider each contract provision . . . in relation to all of the others, with a view toward giving effect to all and ignoring none." *Osguthorpe v. Wolf Mountain Resorts, L.C.*, 322 P.3d 620, 622 (Utah 2013) (internal quotations and citations omitted). "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law." *WebBank*, 54 P.3d at 1145 (citation omitted). The court interprets an unambiguous contract without considering parol or extrinsic evidence. *Plateau Min. Co. v. Utah Div. of State Lands and Forestry*, 802 P.2d 720, 725 (Utah 1990) (citation omitted) ("Parol evidence is generally not admissible to explain the intent of a contract which is clear on its face.").

"Whether a contract is ambiguous is a question of law . . . ." *Plateau Min. Co.*, 802 P.2d at 725 (citation omitted). A contract term or provision is ambiguous "if it is capable of more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other

facial deficiencies." *WebBank*, 54 P.3d at 1145 (internal quotation and citations omitted). "But terms are not ambiguous 'simply because one party seeks to endow them with a different interpretation according to his or her own interests.'" *Mind & Motion Utah Investments, LLC v. Celtic Bank Corp.*, 367 P.3d 994, 1001 (Utah 2016) (quoting *Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 433 (Utah 2006)). "Rather, the proffered alternative interpretations 'must be plausible and reasonable in light of the language used.'" *Id.* (quoting *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998)).[5]

  A. *The P&P Unambiguously Provides LifeVantage With the Remedy it Seeks*

Both parties argue that the contract is unambiguous, although they proffer contrary interpretations of the provision at issue. Defendants argue that the Remedies provision plainly indicates that LifeVantage cannot recover commissions already paid to a distributor, even those paid after a breach. In so arguing, Defendants focus on the language of the Remedies provision that states that a distributor may be subject to a loss of "rights to" bonus and commission "checks." This language, Defendants posit, contemplates a loss of rights to something that is owed in the future and not the return of something already paid. Defendants contend that once a check has been negotiated, the distributor no longer has a right to the check that can be lost because the distributor then has cash or electronic funds. Defendants assert that because the

---

[5] The Utah Supreme Court has further explained what is required of an interpretation that is "plausible:"

> "Plausible" entered the English language from the Latin verb "plaudere," to applaud. Although the primary meaning of the word has evolved to mean likely or reasonable to a degree falling somewhat short of certainty, vestiges of its root live on in its connotation. In other words, to earn the designation of plausible, a notion, explanation, or interpretation must impart confidence in its credibility sufficient to merit our applause. A standing ovation is not required, a discreet collision of the palms will do, but there must be reason to applaud.

*Saleh v. Farmers Ins. Exch.*, 133 P.3d 428, 433 (Utah 2006).

Remedies provision refers specifically to losing "rights to . . . checks," LifeVantage cannot recover the payments it made through checks that have already been negotiated. Defendants submit that had LifeVantage wanted a remedy of disgorgement or refund of already-paid commission and bonus payments, it should have explicitly said so by stating that a breach may result in loss of rights to *funds*, commissions, bonuses or financial distributions.

Defendants' proffered interpretation relies on an extremely strained reading of the term "checks" in the P&P. Defendants' argument requires the court to conclude that the term "checks" means only a negotiable instrument—in essence, the actual, physical piece of paper commonly referred to as a "check"—and that the term was used in the Remedies provision to limit the remedy available to LifeVantage in the event of a breach.[6] Thus, Defendants' argument goes, once the check is negotiated, there is no longer a physical paper check to which a breaching party can lose its right because it is now electronic funds or cash.

Defendants seek to support their proffered interpretation by reference to other provisions of the P&P that they contend support such a reading. Specifically, Defendants cite Sections 17, 8.1, 11.3, and 12.2 of the P&P. Section 17 addresses the issue of commissions paid after the cancellation of a distributor agreement. It provides that a distributor whose distributorship is cancelled will permanently lose "the right to receive future commissions, bonuses or other income resulting from the sales and other activities" of the distributor. Section 8.1 provides that violations of advertising policies "may result in any of the actions set forth in [the Remedies provision] including, without limitation . . . [s]uspension of commissions." Section 11.3 provides that violations of a so-called "70% Sales Rule" will "entitle[] [LifeVantage] to recover any

---

[6] It is simply not plausible that this is the language that would have been used by parties desiring to limit potential recovery to only future payments rather than language similar to that found Section 17.1 of the P&P, which provides that the cancellation of a distributorship results in losing "the right to receive <u>future</u> commissions, bonuses, or other income . . . ." (emphasis added).

commissions paid . . . for any period of time during which [the violation occurred]." Section 12.2 of the P&P allows for LifeVantage to deduct previously paid Financial Distributions in the event that customers return products for which a distributor had previously earned a commission.

LifeVantage responds that Defendants' interpretation ignores the triggering language in the Remedies provision, which plainly states that the potential remedies therein are triggered by "[a]ny breach of the Agreement." LifeVantage argues that the Remedies provision of the P&P unambiguously provides that "*[a]ny breach* of the Agreement . . . may result [in] . . . [l]oss of rights to one or more bonus and commission checks, in whole or in part." LifeVantate notes that this language does not limit it to withholding payments from the time it discovered Defendants' breach. Rather, a distributor loses its rights to payment upon "[a]ny breach." Thus, any payments made after the occurrence of a breach would necessarily have been made to the distributor when the distributor had no rights to them and LifeVantage is therefore entitled to recover all payments made to the distributor from the time of the breach. LifeVantage argues that its interpretation harmonizes with Section 2.6 of the P&P, which states: "Nor shall any delay or omission by LifeVantage to exercise any right arising from a breach affect or impair LifeVantage's rights as to that or any subsequent breach." Thus, any delay in discovering the breach or in asserting Defendants' loss of rights to bonus and commission checks does not preclude LifeVantage from later asserting that right. In other words, once a distributor breaches the agreement, it loses its rights to bonus and commission checks.

LifeVantage further supports its interpretation by pointing to other provisions in the P&P that give LifeVantage the contractual right to "claw back" or recoup commissions or bonuses that it has paid to distributors when they have not, in fact, earned them. For example, LifeVantage points out that under Section 12.4 of the P&P, if a distributor misrepresents his or her eligibility for incentive trips or other awards, LifeVantage "may charge the Independent Distributor for any

11

costs incurred by [LifeVantage] or for any benefits received by the Independent Distributor." Section 12.2 of the P&P also provides that LifeVantage may deduct the amount of money that is attributable to a product that is sold but later returned from a distributor's future checks, thereby "clawing back" previously paid commissions.

LifeVantage also points out that the P&P repeatedly states that any distributor's rights to or eligibility for bonuses and commissions are dependent on compliance with the agreement between the distributor and LifeVantage. For example, Section 12.1 states that all "Distributor[s] must be active and in compliance with the Agreement to qualify for . . . bonuses, and commissions . . . ." If a distributor is not in compliance (i.e., has breached the Agreement), it does not qualify for bonus or commission checks during the period of noncompliance.

Finally, LifeVantage argues that Defendants' proposed interpretation is unreasonable because it would reward a breaching party for successfully concealing its breach for long enough to cash a check it has already received. LifeVantage argues that this highlights Defendants' strained interpretation of the contract because it necessarily assumes that the parties intended to provide a remedy for discovered breaches while immunizing liability for concealed ones.

The court concludes that the agreement is not ambiguous and agrees with LifeVantage's proffered interpretation. Defendants' interpretation is not "plausible and reasonable in light of the language used." *See Mind & Motion*, 367 P.3d at 1001. Defendants rely almost exclusively on the use of the term "checks" and urge a strict construction of that term. But Defendants' reading of "checks" as referring only to the actual instrument itself, rather than the payment that the "check" represents, is unreasonable when read in the context of the provision as a whole and even more implausible when read in light of the agreement as a whole. The Remedies provision provides for the "loss of rights to *one or more* bonus and commission *checks*; *in whole or in part*." The use of the terms "in whole or in part" indicates that a breaching party can lose a

portion of a check. But that would not be possible if the term "check" meant only the paper instrument because a paper check (as opposed to the funds it represents) would be non-divisible. Additionally, the use of the plural "checks," and the fact that rights to "one or more" of those checks can be lost combat Defendants' proffered interpretation that a breaching distributor only loses rights to future unpaid checks from the time LifeVantage discovers the breach and invokes the Remedies provision. A distributor's loss of rights to multiple checks is more naturally read to apply to checks that have already been paid as opposed to checks that have not yet been paid inasmuch as, at any given time, a distributor has at most a potential claim to *one* check only—namely, his or her next check. In short, the fact that the Remedies provision gives LifeVantage the right to recover one or more checks, in whole or in part, is inconsistent with Defendants' view that the term check means only a non-negotiated instrument, because a distributor does not have a present claim or right to *multiple* future checks and a paper check is simply not divisible.

Moreover, although Defendants claim that other provisions of the P&P support its strained interpretation, the provisions of the P&P that Defendants cite either do not support their interpretation or otherwise do not inform the interpretation of the Remedies provision. For example, Section 17 provides that a distributor whose distributorship is cancelled will permanently lose "the right to receive future commissions, bonuses or other income resulting from the sales and other activities" of the distributor. Defendants argue that because this language specifically calls for a loss of the right to *future* commissions, bonuses or other income, the Remedies provision likewise allows LifeVantage to only withhold commission *checks* in the future, not to take back previously paid commissions. But Section 17 is a separate provision applicable only in the case of a cancellation—an event that can occur either voluntarily or involuntarily through non-renewal or inactivity—and does not inform remedies in the event of a breach. Additionally, Section 17 uses language referring specifically to future payments, while

13

the Remedies provision refers more generally to bonus and commission checks, not to *future* bonus and commission checks. The other provisions on which Defendants rely to support their interpretation are similarly unhelpful in interpreting the Remedies provision. Sections 12.2 and 11.3 provide penalties in very specific circumstances and don't inform the Remedies provision at all. On the contrary, the Remedies provision provides that a breach can also result in "[a]ny other measure expressly allowed by the Agreement of [sic] which LifeVantage deems necessary to implement and appropriate in order to provide a remedy for injuries caused partially or exclusively by the Independent Distributor's breach." This indicates that each of the provisions Defendants cite are independent of and in addition to the remedies granted by the Remedies provision and therefore do not limit or otherwise inform them.

After considering the terms of the Remedies provision and construing them in the context of the provision specifically and the agreement generally, the court concludes that the Remedies provision unambiguously provides LifeVantage with the remedy it seeks. Specifically, under the plain language of the Remedies provision, once a distributor breaches the agreement, it loses its rights to bonus and commission checks and LifeVantage can recoup payments made after the breach. Although both parties have presented contrary interpretations of the language contained in the Remedies provision, as detailed above, Defendants' proffered interpretation is simply not plausible or reasonable. *See Plateau Min. Co.*, 802 P.2d at 725 (citation omitted) ("To demonstrate ambiguity, the contrary positions of the parties must each be tenable."). Therefore, the language of the Remedies provision "is [not] capable of more than one reasonable interpretation." *Judge v. Saltz Plastic Surgery, P.C.*, 367 P.3d 1006, 1015 (Utah 2016) (citation omitted). Accordingly, LifeVantage's Damages Theory is one of the remedies unambiguously afforded to it under the parties' agreement.

      B.      *Even if the Court Were to Determine that the Language of the Remedies Provision Were Ambiguous, that Ambiguity Would Necessarily be Resolved in Favor of LifeVantage's Interpretation Because LifeVantage has Presented Uncontradicted Parol Evidence Supporting Its Interpretation*

Even if the court were to determine that it is unclear from the language of the Remedies provision what the parties intended, the ambiguity would necessarily be resolved in favor of LifeVantage's interpretation. If the language of a contract is ambiguous such that the intent of the parties is unclear, "'the intent of the parties becomes a question of fact,' and a 'motion for summary judgment may not be granted if . . . there is a factual issue as to what the parties intended.'" *Id.* (quoting *WebBank*, 54 P.3d at 1145). When there is a factual issue as to what the parties intended, it "may be resolved only by the trier of fact after consideration of parol or extrinsic evidence as to the parties' intentions." *WebBank*, 54 P.3d at 1147. Here, LifeVantage has come forward with extrinsic evidence in support of its interpretation. But Defendants have failed to offer any extrinsic evidence in support of their proffered interpretation. In short, the only extrinsic evidence that the parties have brought forward is that LifeVantage routinely clawed back previously paid commissions from Defendants' checks due to product returns or sales refunds pursuant to Section 12.2 of the P&P. Because LifeVantage's proffered extrinsic evidence is uncontradicted, no genuine issue of fact exists as to whether the extrinsic evidence supports LifeVantage's view that the Remedies provision allows it to recover past, as well as future payments. *See Judge*, 367 P.3d at 1015 n.8 (stating that "[s]ummary judgment is appropriate in cases where undisputed extrinsic evidence establishes that no genuine issue of fact exists as to the meaning the parties intended for an ambiguous provision"). Because no factual issue exists as to the intentions of the parties, interpretation of the contract remains a matter of law. *See Scheenstra v. Cal. Dairies, Inc.*, 213 Cal. App. 4th 370, 390 (2013). Therefore, in light of the uncontradicted extrinsic evidence that LifeVantage has offered in support of its interpretation, even if the court were to find the provision ambiguous, it must necessarily conclude that the

parties intended LifeVantage to be able to recoup checks that it paid from the time of a distributor's breach going forward.

## CONCLUSION

The *TruGreen* case does not foreclose LifeVantage's damages theory. Life Vantage's damages theory is cognizable under Utah law and is supported by general principles of contract damages. Moreover, the parties' agreement unambiguously affords LifeVantage the remedy that it seeks. And even if the court were to conclude that the parties' agreement were ambiguous, only LifeVantage has proffered extrinsic evidence in support of its interpretation. Accordingly, Defendants' motion for summary judgment (Docket 311) is DENIED.

Signed January 18, 2017.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge